**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Angel RUIZ, Defendant–Appellant.**

**No. 90–1787.**

United States Court of Appeals, Seventh Circuit.

Argued Feb. 21, 1991.

Decided May 17, 1991.

Ted S. Helwig, Asst. U.S. Atty., Susan E. Cox, Office of the U.S. Atty. and Barry R. Elden, Asst. U.S. Atty., Office of the U.S. Atty., Crim. Receiving, Appellate Div., Chicago, Ill., for plaintiff-appellee.

Robert A. Korenkiewicz, Chicago, Ill., for defendant-appellant.

Before BAUER, Chief Judge, and COFFEY and EASTERBROOK, Circuit Judges.

BAUER, Chief Judge.

A jury concluded that Angel Ruiz was, in fact, no angel: it found him guilty of one count of conspiracy to distribute cocaine in violation of 21 U.S.C. § 846 and one count of distribution of cocaine in violation of 21 U.S.C. § 841(a)(1). The district court entered judgment on this verdict and sentenced Ruiz under the United States Sentencing Guidelines ("Guidelines") to a term of 160 months. In this appeal, Ruiz challenges both his conviction and his sentence. We affirm the former but, because the court committed error in the application of the Guidelines, we vacate Ruiz's sentence and remand the case for resentencing.

## I

The path that led authorities to Angel Ruiz began with Roberto Diaz. Diaz was a street-level drug dealer who, in the fall of 1987, began selling cocaine to "Francisco" Guerra. That choice of customer would be Diaz's undoing, as Frank Guerra was an undercover special agent with the Illinois State Police. Diaz's sales to Agent Guerra started small: an eighth of an ounce here, an ounce and a half there. After Diaz and Agent Guerra became better acquainted through these small deals, they began discussing larger transactions. Agent Guerra also started bringing his brother Fred along. Fred Guerra, as it turns out, was an undercover narcotics deputy employed by the Cook County Sheriff's Department.

When Agent Guerra expressed interest in larger transactions, Diaz assured him that he could get his hands on kilogram quantities of cocaine. Diaz quoted Agent Guerra a tentative price of $29,000 per kilo, contingent upon the approval of his source. He later told Agent Guerra that he could get the cocaine for $27,000 per kilo, with a discount for multi-kilogram purchases. Agent Guerra told Diaz that he was interested in buying not one but two kilograms. Diaz said no problem. Negotiations between Diaz and Agent Guerra continued, with the two eventually agreeing on a price of $52,000 for the two kilos.

According to Diaz's testimony, his source for cocaine was Jose Sandoval. Sandoval testified that his source, in turn, was Angel Ruiz.[1] Like much else in the American economy, the Ruiz-to-Sandoval-to-Diaz operation ran on credit. Ruiz would give the cocaine to Sandoval on consignment, Sandoval agreeing to pay Ruiz, say, X dollars per ounce, as soon as he sold the cocaine to one of his customers. Sandoval would in turn consign the cocaine to Diaz for an agreed price of X + 50 dollars or X + 100 dollars per ounce, to be paid when Diaz sold the cocaine to one of his customers. Diaz, of course, would then try to sell the cocaine for more than he owed Sandoval so that he, too, could make a profit. The two-kilogram deal was to work in the same fashion: Diaz was to pay Sandoval $40,000 ($20,000 per kilo) after he collected the $52,000 from the Guerras. (The record does not reveal how much Sandoval would skim off of the $40,000 before paying Ruiz.) Diaz thus would make $12,000 in gross profit, out of which he would pay Sandoval an extra $2,000 for

---

1. Ruiz hotly contested the credibility of Diaz's and Sandoval's testimony in his arguments to the jury, and he continues to do so in his arguments to this court. We will not undertake to sort out all of the claimed inconsistencies and the claimed motives to lie. The jury had that task, and Ruiz's trial counsel did a commendable job putting before the jury all sorts of impeachment evidence. What we examine and recount here is the evidence and testimony upon which the jury could have relied in finding Ruiz guilty.

his help at the delivery, leaving Diaz a net profit of $10,000.

The two-kilogram deal, which was to be the last drug deal for this particular distribution outfit, went down as follows. On December 17, 1987, Diaz phoned Agent Guerra and told him that "his people were ready" to make the two-kilogram transaction. Transcript of Trial Proceedings ("Trial Tr."), Vol. II, p. 57. They arranged to meet that evening at the parking lot of a Zayre's department store in Lyons, Illinois, to make the exchange. Early that evening, Diaz met Sandoval at a bar and told him the buyer was ready. Sandoval stepped out and called Ruiz's house to arrange the pick up of the drugs, but no one was home. Sandoval then decided to take Diaz to a location in Cicero, Illinois, where Sandoval knew he could get the cocaine from Ruiz. (In a transaction of this size, Sandoval planned to accompany Diaz every step of the way.)

With Sandoval in the passenger seat giving directions, Diaz drove to Cicero and parked in an alley. While Diaz waited in the car, Sandoval met in the alley with Ruiz and another man named Antonio Marquez. Diaz as yet had not met Ruiz or Marquez, and would learn their names only after they all had been arrested. After chatting briefly in the alley, Ruiz, Marquez, and Sandoval came over to Diaz's car. Ruiz told Diaz that he had only one kilogram of cocaine. Diaz was upset, and told Ruiz that he needed—and had asked Sandoval for—two kilograms. Ruiz then responded, according to Diaz's testimony: "It doesn't matter. I'll get you the other kilo. And, if you want, even ten more I can get." Trial Tr., Vol. III, p. 162.[2] Ruiz and Marquez then asked where the transaction with Diaz's customer was to occur, and Diaz told them the Zayre parking lot. Ruiz rejected that site, and they decided instead that the transaction should occur at Diaz's apartment. Diaz said he would have to go back and tell his customer about the change in location. Ruiz assented, and told Diaz to take Marquez along and show him where the apartment was.

Diaz and Sandoval drove off, with Marquez following in his own car. The caravan stopped by Diaz's house, where Marquez peeled off to go back and pick up Ruiz. Diaz and Sandoval proceeded to the Zayre parking lot to meet the Guerras. Diaz introduced Sandoval to the Guerras and informed Agent Guerra that the exchange had to take place at his apartment. But Agent Guerra said no sale. He flashed Diaz and Sandoval a peek at the bag containing the $52,000 and told them that the exchange would take place in the parking lot or not at all. Sufficiently persuaded, Diaz and Sandoval agreed to fetch the cocaine and return to the parking lot.

Back at Diaz's apartment, Diaz and Sandoval delivered the news to Ruiz and Marquez, who were waiting out front in Marquez's car. Sandoval and Diaz walked over to the car, in which Ruiz occupied the passenger seat, and the four conferred briefly. When told of Diaz's customers' insistence on the Zayre parking lot, Ruiz assented to that site. Marquez reached below the seat of the car and pulled out a one-kilogram package of cocaine, which he handed out the driver-side window to Diaz, who stuffed the package under his sweater. Ruiz handed the other kilo out the passenger-side window to Sandoval, who stuffed it under his jacket. Diaz and Sandoval then walked hurriedly back to Diaz's car. An undercover DEA agent who was positioned at that time some distance behind Diaz's car testified at trial that, when Sandoval hurried back to Diaz's car, he walked "slightly hunched over, with his hands clasped to the front of his body, almost like a fullback would carry the ball in a football game...." Trial Tr., Vol. V, p. 396.

With the kilograms in-hand, Diaz and Sandoval drove directly to the Zayre parking lot. Marquez and Ruiz followed closely in Marquez's car. Diaz pulled into the parking lot next to the Guerras' car, and

---

**2.** Similarly, Sandoval testified that, after he and Diaz told Ruiz that two kilograms were needed, Ruiz said, "[A]ll I have here is one in the car." At which point Sandoval asked, "Can you also sell us the other one?" and Ruiz responded, "[S]ure, of course, even ten, if you want." Trial Tr., Vol. IV, p. 308.

Marquez and Ruiz positioned their car about 50 feet away. Diaz and Sandoval got out of their car and walked over to the Guerras' car, where they delivered the two kilograms of cocaine to the Guerras. Deputy Guerra then gave the arrest signal and the dozen or so agents who had been staking out the scene closed in and pinched all four suspects: Diaz, Sandoval, Marquez, and Ruiz.

The following day, December 18, 1987, the government filed a criminal complaint charging all four with distribution of two kilograms of cocaine in violation of 21 U.S.C. § 841(a). About one month later, however, on the government's oral motion, the court dismissed the charge against Ruiz and released him from custody. The remaining three defendants subsequently were indicted for both conspiracy to distribute cocaine and distribution of cocaine, to which charges they each pleaded guilty. Diaz and Sandoval, in return for their pleas and their promises to testify against Ruiz, received sentences of two and one-half years and three and one-half years, respectively—substantially lower than the sentences they would have received under the Guidelines.

Diaz and Sandoval then were brought before the grand jury, which returned a two-count indictment against Ruiz, charging him with conspiracy under 21 U.S.C. § 846 and distribution under 21 U.S.C. § 841(a). In December 1989, the case was tried to a jury, which found Ruiz guilty on both counts. The district court subsequently denied Ruiz's post-trial motions and held a sentencing hearing. Because the conduct that constitutes the core of this offense occurred after November 1, 1987, the court applied the Guidelines, under which the court sentenced Ruiz to 160 months on each count to run concurrently. Ruiz filed a timely appeal, raising various challenges to both his conviction and his sentence.

## II

### A. Sufficiency of the Evidence

■ First, and most predictably, Ruiz argues that the evidence presented by the government was insufficient to support his conviction on either count. This is so, argues Ruiz, because the convictions are based entirely on the uncorroborated testimony of Diaz and Sandoval, two drug-dealing - felons - turned - government - informants who simply cannot be believed. As we have too-often reminded counsel, "this argument is wasted on an appellate court." *United States v. Molinaro*, 877 F.2d 1341, 1347 (7th Cir.1989). Ruiz thoroughly attacked Diaz's and Sandoval's credibility at trial, and the jury, "which is the only entity entitled to make such credibility determinations, apparently decided to believe" their testimony despite their "many character flaws." *Id.* (citation omitted). *See also United States v. Beverly*, 913 F.2d 337, 358 (7th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 766, 112 L.Ed.2d 786 & —— U.S. ——, 111 S.Ct. 951, 112 L.Ed.2d 1039 (1991). In other words, Ruiz had his shot to sell Diaz and Sandoval as liars, but the jury didn't buy it.

Apart from this credibility challenge, Ruiz argues generally that the convictions must be overturned because they were based on uncorroborated hearsay. In reviewing such sufficiency challenges, we ask whether, "viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original). *See also United States v. Haddon*, 927 F.2d 942, 950 (1991); *United States v. McNeese*, 901 F.2d 585, 600 (7th Cir.1990) ("Only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt, may an appellate court overturn the verdict.") (quotation and citations omitted). We will spare ourselves, and the reader, the recapitulation of the record evidence summarized above; suffice it to say that, viewing the evidence in light of these standards, we conclude that the distribution conviction must stand.

■ Ruiz's sufficiency challenge to the § 846 conspiracy conviction merits a few,

additional words. The government was required to prove both the existence of the conspiracy and Ruiz's membership in, or participatory link to, the conspiracy. As Ruiz correctly argues, on review this court requires that there be "substantial evidence" in support of these elements before we will sustain a conspiracy conviction. *United States v. Durrive*, 902 F.2d 1221, 1225–29 (7th Cir.1990).[3] It is also true, however, that the government may use "circumstantial evidence as support, even sole support, for a [conspiracy] conviction." *Durrive*, 902 F.2d at 1229. Ruiz suggests that the government has failed to meet its evidentiary burden regarding his membership in the conspiracy. He submits that the record supports at most the notion that he merely knew of the conspiracy, associated with some of its members, and was present at its last criminal act, none of which is sufficient to establish membership. *See United States v. Atterson*, 926 F.2d 649, 655–56 (7th Cir.1991); *Durrive*, 902 F.2d at 1225. The record supports a good deal more than that. The government introduced evidence, as summarized above, that Ruiz was the ultimate supplier for a conspiracy that dealt cocaine in quantities both large and small. After Ruiz supplied the cocaine, he retained an interest in it while he waited for his money to make its way back up the chain. When it came time for the big transaction, Ruiz showed up in person and directed the deal. Further, both Diaz and Sandoval placed Ruiz at the scene when the two kilograms were handed over to them, and the undercover agent's "fullback" testimony corroborates that transfer. Finally, when the whole group was arrested in the parking lot, Ruiz was there with Marquez keeping an eye on his investment. From all this evidence, the jury concluded that Ruiz was not merely along for the ride but was a member of the distribution conspiracy. That conclusion will not be disturbed.

**B. The Jury Instructions**

Ruiz's second line of attack on his conviction regards the jury instructions. Over the objection of Ruiz's counsel, the district court gave the standard aiding and abetting instruction used in this circuit, *see* Federal Criminal Jury Instructions of the Seventh Circuit ("F.C.J.I. 7th Cir.") § 5.08 (1980), as well as the *Pinkerton* instruction that is reproduced in the margin,[4] both of which were offered by the government. We note at the outset that we review jury instructions as a whole, and "[a]s long as the instructions treat the issues fairly and adequately, they will not be interfered with on appeal." *McNeese*, 901 F.2d at 607 (quotation and citations omitted). *See also United States v. Doerr*, 886 F.2d 944, 960 (7th Cir.1989). Thus, before we consider any of Ruiz's particular jury instruction challenges, we must widen the lens and look at the instructions in their entirety.

After the standard opening instructions defining the jury's role and duty and the nature and types of evidence, the court admonished the jury that Diaz and Sandoval had pleaded guilty and that their testimony "must be considered with caution and great care" and that their guilty pleas should not be considered as evidence against Ruiz. Trial Tr., Vol. V, p. 551. The court then gave the standard instructions regarding the indictment, the presumption of innocence, and the government's burden of proof. After explaining that the indictment charges two separate crimes, the court quoted and explained the

---

3. Although Ruiz's trial was held before *Durrive* was decided, the standard of review established in that case applies nonetheless. *See United States v. Lamon*, 930 F.2d 1183, 1191 n. 17 (7th Cir.1991); *United States v. Kimmons*, 917 F.2d 1011, 1015 n. 5 (7th Cir.1990).

4. If it is established beyond a reasonable doubt that a conspiracy existed and it is established beyond a reasonable doubt that a particular defendant was a member of the conspiracy, then the acts and declarations of any other member of such conspiracy in or out of the defendant's presence, done in furtherance of the objects of the conspiracy and during its existence, may be considered as evidence against the defendant. When persons enter into an agreement for an unlawful purpose, they become agents for one another and are responsible for each other's actions made during the existence of the conspiracy and in furtherance of its unlawful purpose.
Trial Tr., Vol. V, p. 554.

statute at issue in the first count: 21 U.S.C. § 846, the conspiracy statute. The court then gave our standard instruction listing the elements of conspiracy. *See* F.C.J.I. 7th Cir. § 5.11 (The court omitted the portions of the instruction that refer to "overt acts," because § 846 does not require proof of an overt act.) The conspiracy elements instruction included the statement, "In determining whether the defendant became a member of the conspiracy, you may consider only the acts and statements of that particular defendant,"[5] and ended with the sentence, "The government must prove beyond a reasonable doubt from the defendant's own acts and statements that he was aware of the common purpose and was a willing participant." Trial Tr., Vol. V., pp. 553–54. The court then gave the *Pinkerton* instruction reproduced *supra* at note 4, followed by an instruction quoting the statute involved in the second count: 21 U.S.C. § 841(a)(1), substantive distribution. In explaining this charged offense, the court defined "distribution" and listed the elements of the offense pursuant to our standard instructions. *See* 3 Federal Criminal Jury Instructions of the Seventh Circuit ("3 F.C.J.I. 7th Cir.") 116 & 117 (1986). The court then gave our standard instruction defining "knowingly," F.C.J.I. 7th Cir. § 6.04, followed by an instruction admonishing the jury that mere presence at the scene, knowledge of the crime and/or association with its participants is insufficient to establish guilt or membership in a conspiracy. In the final substantive instruction, the court reminded the jury that both crimes charged require that Ruiz acted "knowingly and intentionally," and that it was Ruiz's theory of defense that he did neither.

1. The Aiding and Abetting Instruction

■ Over half a century ago, Judge Learned Hand penned the classic description of the elements required for aiding and abetting liability in *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir.1938). This circuit has incorporated Judge Hand's formulation, along with the language of 18 U.S.C. § 2(a) (aiders and abettors punishable as principals), into our standard instruction. *See United States v. Valencia*, 907 F.2d 671, 680–81 (7th Cir.1990); *McNeese*, 901 F.2d at 608. The district court gave that standard instruction in this case. Ruiz does not challenge the sufficiency or validity of the aiding and abetting instruction, but argues that it should not have been given in this case because his indictment did not charge him with aiding and abetting and because the evidence at trial did not warrant the instruction.

As to the former argument, it is well-established that a defendant need not be charged separately with aiding and abetting for that theory of liability to be presented to the jury, so long as the evidence warrants the instruction and no unfair surprise results. *See United States v. Galiffa*, 734 F.2d 306, 311–12 (7th Cir. 1984), *cert. denied*, 474 U.S. 1032, 106 S.Ct. 592, 88 L.Ed.2d 572 (1985). On appeal, Ruiz suggests that this case fits into the "unfair surprise" exception. This suggestion is too little, too late: Ruiz made no mention of any "surprise" at the instructions conference held by the district court, and he has not even attempted to point to any prejudice that resulted from the alleged "lack of adequate notice." Moreover, "[b]ecause aiding and abetting does not constitute a separate crime, all indictments are to be read as if the alternative provided by the aiding and abetting statute, 18 U.S.C. § 2, is included therein." *Galiffa*, 734 F.2d at 312 (quotation and citations omitted).

■ Ruiz's other argument—that the evidence did not warrant the aiding and abetting instruction—was considered and rejected by the district court at the instruc-

---

5. In *United States v. de Ortiz*, 907 F.2d 629 (7th Cir.1990) (*en banc*), *cert. denied*, — U.S. —, 111 S.Ct. 684, 112 L.Ed.2d 676 (1991), we held that this portion of § 5.11 conflicts with Fed.R. Evid. 104 and *Bourjaily v. United States*, 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987), in that it overly favors the accused. This case

was tried well before our decision in *de Ortiz*, and neither party has raised the conflict with *Bourjaily*—the government, of course, need not, as it attained a conviction, and Ruiz would not, as any "error" worked in his favor. Thus, we will not venture into that thicket here.

tions conference. The court noted that the second count charged Ruiz with distribution of two kilograms of cocaine, but the evidence at trial established that Diaz and Sandoval made the actual delivery of those kilograms to Agent Guerra. The court ruled that an aiding and abetting instruction was called for because the evidence supported the inference that the acts of Diaz and Sandoval were induced and commanded by Ruiz, and because Ruiz did not personally participate in the delivery of the two kilograms. *See* Trial Tr., Vol. V, p. 495. That ruling did not constitute reversible error. The jury could have inferred from the evidence that Ruiz, although he did not personally hand the two kilograms to the agents, knowingly facilitated the distribution of those kilograms, and the challenged instruction properly apprised the jury as to the elements of aiding and abetting liability to be applied to that inference.

2. The *Pinkerton* Instruction

■ The *Pinkerton* instruction given by the district court in this case differs markedly from our pattern instruction. *Compare* 3 F.C.J.I. 7th Cir. 6. Mere semantical differences, of course, are insignificant, but more is at issue here. As we stated recently when reviewing an essentially identical instruction, this version of the *Pinkerton* instruction "fail[s] to list every element of the *Pinkerton* doctrine with precision." *United States v. McKenzie*, 922 F.2d 1323, 1330 (7th Cir.1991) (discussing deficiencies in this version of *Pinkerton* instruction). We need not examine in detail the shortcomings of this instruction, however, because in this case, as in *McKenzie*, the defendant failed to object to the wording of the instruction at trial, and the deficiencies contained in this abbreviated *Pinkerton* instruction do not constitute "plain error." *See McKenzie*, 922 F.2d at 1330 & n. 4.

What Ruiz did object to at trial, and continues to object to on appeal, is the fact that a *Pinkerton* instruction was given at all. Ruiz maintains that the instruction "nullified" the immediately preceding instruction listing the elements required for a conspiracy conviction, and in particular the portions of that conspiracy instruction

regarding the required mental state and proof of membership. As with the aiding and abetting instruction, Ruiz also argues that the *Pinkerton* instruction was "inappropriate to the facts of this case" because those facts established, if they established criminal liability at all, that Ruiz was directly liable. These challenges are meritless. The *Pinkerton* instruction did not, by its placement or its language, negate the conspiracy elements instruction, which explicitly placed on the government the burden to prove, by defendant's own acts and statements, his awareness of the common purpose of, and his membership in, the conspiracy. Indeed, the *Pinkerton* instruction began with the words "*If* it is established beyond a reasonable doubt that a conspiracy existed and it is established beyond a reasonable doubt that a particular defendant was a member of the conspiracy, ..." (emphasis added). This introductory phrase should have prevented the jury from using the conditional *Pinkerton* instruction to "negate" the elements instruction. Further, in the instruction regarding the elements of the substantive distribution count, which immediately followed the *Pinkerton* instruction, the jury was reminded again that the government was required to prove beyond a reasonable doubt that Ruiz knowingly or intentionally distributed cocaine. And finally, as we discuss above, the evidence at trial did in fact support an agency theory of liability, in that Ruiz distributed the two kilograms through Diaz and Sandoval. Thus, viewed in the context of the instructions as a whole and in light of the evidence adduced at trial, the district court's decision to give a *Pinkerton* instruction was not reversible error.

3. The Intent Instructions

■ Ruiz's final challenge to his conviction concerns the district court's refusal to give two jury instructions he tendered. The first would have defined and distinguished "specific intent" and "general intent," and the second would have defined the word "intentionally" as "consciously will[ing] those of his actions which constitute elements of the crimes charged." The

rejection of these tendered instructions was not reversible error. We have recommended to the district courts that they avoid instructions that drag the jury through the "specific intent"/"general intent" quagmire, because such instructions "more than likely confuse rather than enlighten juries." F.C.J.I. 7th Cir. § 6.02. We have suggested instead that courts give the instruction(s) that "define the precise mental state required by the particular offense charged." *Id.* *See also United States v. Markowski,* 772 F.2d 358, 364–65 (7th Cir.1985) ("A jury should be told only what it needs to know, not what might confuse."), *cert. denied,* 475 U.S. 1018, 106 S.Ct. 1202, 89 L.Ed.2d 316 (1986).

The indictment charged Ruiz with two offenses: distribution of two kilograms of cocaine in violation of 21 U.S.C. § 841(a)(1), which contains the mental states "knowingly or intentionally," and conspiracy to distribute cocaine in violation of 21 U.S.C. § 846, which does not itself contain a mental state, but which, according to our standard instruction (given in this case), can only be sustained if the defendant "knowingly and intentionally became a member of the conspiracy." F.C.J.I. 7th Cir. § 5.11. The district court properly informed the jury that these were the required mental states, that the government was required to prove them beyond a reasonable doubt, and that it was Ruiz's theory of defense that he acted "neither knowingly nor intentionally." Trial Tr., Vol. V, p. 556. The court also decided to give our standard definition of "knowingly," but rejected as unnecessary Ruiz's tendered instruction defining "intentionally." That tendered instruction would only have introduced another phrase, "consciously willed," that itself would have required an explanation or definition. Viewing the instructions as a whole, we are convinced that the jury was told what it "needed to know" here, and that the required mental states for Ruiz's offenses were set forth adequately for the jury.[6]

## III

Ruiz also challenges his sentence under the Guidelines. Ruiz's sentencing hearing was held on March 30, 1990. Some months earlier, the court had ordered a pre-sentence investigation and report by the Probation Department. That report calculated Ruiz's base offense level as 28, using the total amount of cocaine actually distributed by the Ruiz–Sandoval–Diaz conspiracy (2,081.85 grams). The report rejected the government's recommendation that Ruiz also be held accountable for the ten kilograms that Diaz and Sandoval said Ruiz mentioned, stating that the evidence was unclear as to whether Ruiz had access to that cocaine. The report then recommended a two-level increase in the offense level pursuant to Guidelines § 3B1.1(c) because of Ruiz's "managerial role" in the offense. The final adjusted offense level recommended in the report was 30, which would have, in combination with Ruiz's criminal history category, resulted in a sentencing range of 108–135 months.

Ruiz objected to the managerial role adjustment, and argued the point at the sentencing hearing. The court also heard argument from both sides concerning whether Ruiz should be held accountable for ten kilograms of cocaine based on the "even ten more I can get" statement. The court concluded that he should, and, accordingly, fixed Ruiz's base offense level at 32 (five to fifteen kilograms of cocaine). The court then awarded a two-level enhancement for managerial role, resulting in an adjusted offense level of 34. An offense level of 34 produced, in Ruiz's case, a sentencing range of 151–188 months. After hearing argument in mitigation and aggravation, the court picked a sentence in the low end

---

**6.** *United States v. Liparota,* 471 U.S. 419, 105 S.Ct. 2084, 85 L.Ed.2d 434 (1985), relied upon heavily by Ruiz, is not to the contrary. In that case, the Supreme Court reversed a conviction under 7 U.S.C. § 2024(b)(1) (food stamp fraud) because the trial court's jury instructions allowed the jury to find the defendant guilty with no showing by the government of any mental state regarding one element of the offense: that the acquisition or possession of the food stamps was unauthorized by law. In this case, the jury was properly instructed as to the mental state the government was required to prove for each element of the offenses.

of that range, 160 months, plus a special assessment of $100 and a five year period of supervised release.

## A. The Managerial Role Adjustment

■ On appeal, Ruiz first repeats his claim that he should not have received a two-level upward adjustment under Guidelines § 3B1.1(c). Ruiz contends that the evidence showed that he and his coconspirators merely had a "buyer-seller" relationship, not one in which he was calling the shots. The district court, in contrast, found that the evidence established that Ruiz maintained control and supervision of the others from "a field general's position." Transcript of Proceedings on March 30, 1990 ("Sent.Tr."), p. 29. That finding resolved a factual issue—Ruiz's role in the conspiracy—and will only be reversed for clear error. *United States v. Spillman*, 924 F.2d 721, 723 (7th Cir.1991). *See also* 18 U.S.C. § 3742(e) (when reviewing a sentence, the court of appeals "... shall accept the findings of fact of the district court unless they are clearly erroneous ..."). No clear error was committed here. Diaz and Sandoval, whom the court determined to be telling the truth, testified that Ruiz was the supplier of the cocaine; set the price for the cocaine; had decision-making authority over the details of the distribution of the cocaine, including, for the two-kilogram transaction, the timing and location of the deal; and, with Marquez, physically oversaw the two-kilogram deal. Several of these factors were corroborated by the testimony of undercover agents concerning, among other things, the actions of Ruiz on the day of the arrest. Thus, the district court's upward adjustment pursuant to § 3B1.1 will not be disturbed. *Cf. United States v. Franco*, 909 F.2d 1042, 1046–47 (7th Cir.1990).

## B. The Quantity of Cocaine

■ Second, Ruiz argues that the statement attributed to him by Diaz and Sando-val in their trial testimony was insufficient grounds for the court to use ten kilograms in calculating his offense level.[7] Guidelines § 1B1.3 instructs the sentencing court to consider, when it is calculating base offense level and making adjustments, various categories of "relevant conduct," including "all acts and omissions committed or aided and abetted by the defendant, or for which the defendant would be otherwise accountable, that occurred during the commission of the offense of conviction," § 1B1.3(a)(1), as well as "acts and omissions that were part of the same course of conduct or common scheme or plan as the offense of conviction." § 1B1.3(a)(2) (Amended versions effective Nov. 1, 1989). Guidelines § 2D1.4(a), in turn, provides that the offense level for a conspiracy involving drugs "shall be the same as if the object of the conspiracy ... had been completed." (Amended version effective Nov. 1, 1989). Application Note 1 to § 2D1.4(a) explains further that,

> [i]f the defendant is convicted of an offense involving negotiation to traffic in a controlled substance, the weight under negotiation in an uncompleted distribution shall be used to calculate the applicable amount. However, where the court finds that the defendant did not intend to produce and was not reasonably capable of producing the negotiated amount, the court shall exclude from the guideline calculation the amount it finds the defendant did not intend to produce and was not reasonably capable of producing.

(Amended version effective Nov. 1, 1989).

Thus, under these provisions, Ruiz's base offense level should have been calculated based on ten kilograms if that amount was "under negotiation in an uncompleted distribution" and Ruiz intended to produce and was "reasonably capable of producing"

---

7. Ruiz expends much time and energy arguing that Marquez, not he, made the ten kilogram statement, which argument relies on a disputed police affidavit and the supposition that Diaz and Sandoval were lying in their testimony. After seeing the affiant police officer, Diaz, and Sandoval testify, the district court concluded that the officer had been mistaken and that Diaz and Sandoval were telling the truth. Giving due regard to the district court's superior opportunity to assess the credibility of witnesses, we find no clear error in that factual conclusion. *See* 18 U.S.C. § 3742(e). Therefore, we accept as fact that Ruiz made the statement attributed to him by Diaz and Sandoval.

ten kilograms. It was the government's burden to prove these elements by a preponderance of the evidence. *See United States v. White*, 888 F.2d 490, 499 (7th Cir.1989). The district court concluded that it had: "I think [Ruiz] made [the ten kilogram] indication not as an idle boast but that he had the intention to produce that ten kilograms, if necessary, and, frankly, based upon his capability of producing the drugs he did produce, I believe he was reasonably capable of producing the ten kilograms he said he could produce." Sent. Tr., p. 30.

That conclusion cannot withstand scrutiny. This was not a case in which the defendant had actually arranged the details of a drug sale (e.g., price, quantity, location), but was arrested with or charged for a smaller amount of drugs because the pinch was made before the larger deal could be completed, as were *United States v. Macias*, 930 F.2d 567 (7th Cir.1991); *United States v. Buggs*, 904 F.2d 1070 (7th Cir.1990); and *United States v. Vopravil*, 891 F.2d 155 (7th Cir.1989). Nor was this a case in which a negotiated deal fell through because the buyer found a better deal elsewhere, as was *Franco*, 909 F.2d at 1045–47. In this case, according to the evidence, the *only* drug sales arranged by Ruiz and his coconspirators involved amounts actually delivered: a total of approximately 2.08 kilograms. Ruiz's single comment was not sufficient to establish that the conspiracy had as its goal the consummation of a deal for upwards of ten kilograms. Such an amount never had been mentioned to Agent Guerra; there was no evidence of other buyers for such an amount; no price had been set or even quoted for such an amount; indeed, there was no evidence of any kind that Ruiz had in his possession or had access to that amount of cocaine. And how much, really, can be made of Ruiz's comment? "Even ten more I can get" is hardly the negotiation of a specific drug transaction. If so, then had Ruiz said "I can get you tons more," or even "I can get you all the cocaine in Colombia," he could have been held accountable for those amounts—a result that could not have been intended by Guidelines §§ 1B1.3 and 2D1.4.

Standing alone, as it does here, an offhand statement referring to larger quantities of narcotics that amounts to no more than braggadocio is insufficient to establish that those quantities were "under negotiation" as envisioned in Guidelines § 2D1.4(a). Thus, the district court's sentence calculation utilizing ten kilograms was reversible error. *Cf. United States v. Moon*, 926 F.2d 204, 208–10 (2d Cir.1991) (conversations early in the negotiations concerning the availability and price of "one or two" kilograms not sufficient to sustain district court's sentence calculation based on two kilograms, where the evidence revealed that the total amount the buyer actually sought to and did purchase was one kilogram); *United States v. Foley*, 906 F.2d 1261, 1264–65 (8th Cir.1990) (reversing district court's finding that additional two ounces of cocaine were "negotiated" where conversation mentioning these quantities did not have the specificity that attended the other drug transactions). Ruiz's base offense level should have been calculated, as the presentence report suggested, on the basis of the amount of cocaine that actually was distributed by this conspiracy. That offense level (28), combined with a two-level managerial role enhancement, would have yielded an adjusted offense level of 30 and a sentencing range of 108–135 months. The 160 month sentence imposed by the district court must be vacated and the case remanded for resentencing using the proper adjusted offense level.

## IV

Angel Ruiz was convicted, in large measure, on the say so of his coconspirators. That fact does not differentiate his case from the mine-run of conspiracy and narcotics cases, nor does it indicate a failure of proof by the government. In addition, the court committed no error in its charge to the jury, and, therefore, Ruiz's conviction is AFFIRMED. Error was committed, however, in the calculation of Ruiz's sentence under the Guidelines. Therefore, the sentence is

VACATED and the case is REMANDED for resentencing consistent with this opinion.

SO ORDERED.