4 F.3d 986
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of AMERICA, Plaintiff-Appellee,
v.
Vittorio Giuseppe CUCCI, a/k/a Victor, Defendant-Appellant.
UNITED STATES of AMERICA, Plaintiff-Appellee,
v.
Joseph COVELLO, a/k/a Giuseppe, Defendant-Appellant.
 Nos. 92-5533, 92-5534.
 United States Court of Appeals,
Fourth Circuit.
 Argued: April 1, 1993.
Decided: September 3, 1993.
 
 Appeals from the United States District Court for the Southern District of West Virginia, at Beckley. Elizabeth V. Hallanan, District Judge. (CR-91-230-5)
 ARGUED: David L. White, Sanders, Watson & White, Bluefield, West Virginia, for Appellant Cucci;
 Anthony F. Anderson, Law Offices of Anthony F. Anderson, Roanoke, Virginia, for Appellant Covello.
 Hunter P. Smith, Jr., Assistant United States Attorney, Charleston, West Virginia, for Appellee.
 ON BRIEF: Melissa Friedman, Roanoke, Virginia, for Appellant Covello.
 Michael W. Carey, United States Attorney, Charleston, West Virginia, for Appellee.
 S.D.W.Va.
 AFFIRMED.
 Before POWELL, Associate Justice (Retired), United States Supreme Court, sitting by designation, and HALL and NIEMEYER, Circuit Judges.
 PER CURIAM:
 
 OPINION
 
 1
 Vittorio (Victor) Cucci and Joseph Covello were convicted of conspiracy to distribute more than 500 grams of cocaine in violation of 21 U.S.C. Sec. 846, and Cucci was additionally convicted of two counts of illegal use of a communication facility in violation of 21 U.S.C. Sec. 843(b). Cucci was sentenced to 170 months imprisonment and fined $17,500; Covello was sentenced to 188 months and fined $20,000. Both men now challenge numerous aspects of their convictions and sentences. Cucci argues primarily that he was entrapped as a matter of law and that five kilograms of cocaine should not be attributed to him for sentencing purposes. Covello raises evidentiary questions and challenges the sufficiency of the evidence. Finding no reversible error, we affirm.
 
 
 2
 * For reasons not fully revealed in the record, the Drug Enforcement Agency (DEA) long suspected that Victor Cucci was a drug supplier. In December 1990, as part of a broader investigative effort conducted in cooperation with the Virginia and West Virginia police, the DEA enlisted Robert Seidman, who was cooperating as the result of a plea agreement, to act as an informant to determine whether Cucci was involved with drugs. Seidman and his wife had been arrested in March 1990, having in their possession roughly a half a pound of cocaine, more than twenty pounds of marijuana, and some LSD. Seidman pled guilty to a single count of possession of cocaine with intent to distribute and agreed to act as an informant.
 
 
 3
 Seidman visited Cucci at Cucci's pizzeria in Covington, Virginia, and spoke to him six to ten times without making any reference to drugs. On April 22, 1991, at a time when Cucci was taking on a new business of becoming a Toyota dealer, Seidman told Cucci for the first time that Seidman was a drug dealer who needed a new source. Although Cucci responded "that wasn't his thing," and manifested a reluctance to handle drugs, he showed no reluctance in stating that he had a partner who "was handling that part of the business." Over the next few months, a number of conversations followed during which Seidman and Cucci negotiated the details of a drug deal, as well as the purchase by Seidman of a car from Cucci's dealership. The two men often referred to kilograms of cocaine as "cars," although in other conversations they referred to actual cars to be purchased from Cucci's dealership. While the principal discussions related to an initial drug transaction involving one to two kilograms of cocaine, an ongoing arrangement was discussed and anticipated. Throughout the negotiations, however, Cucci attempted to remain as a broker, relaying messages between Seidman and his supplier in Brooklyn, New York. Cucci told Seidman that he was only involved in the transaction to help Seidman out, and that he did not wish to be paid anything.
 
 
 4
 After Seidman repeatedly asked Cucci to introduce him to his source, Cucci agreed, telling Seidman on different occasions that he did not want to be involved after introducing Seidman. Even though no introduction actually took place, Seidman did learn that Cucci's "partner" in Brooklyn was someone Cucci knew from his childhood in Sicily who had immigrated to the United States in 1962. The DEA suspected that Cucci's source was Joseph Covello, a family friend from Cucci's hometown in Sicily now living in Brooklyn.
 
 
 5
 Although Cucci supplied Seidman on June 18, 1991, with an unsolicited sample of cocaine weighing 0.38 gram, the sale that was the subject of the negotiations took place on July 25, 1991. On the morning of the 25th, Cucci called Seidman to consummate the deal, and the two men met at Cucci's Toyota dealership. At the outset Cucci related a problem. Until then, Seidman had expected to buy one kilogram of cocaine and a car for a total of $45,000 ($30,000 for the cocaine and $15,000 for the car). Cucci informed Seidman, however, that his supplier from Brooklyn had brought two kilograms of cocaine and expected to be paid $60,000 for both. After some further discussions, Cucci left Seidman, returning in a short time with $15,000 in cash. The men agreed that the $15,000 which Cucci brought back would be combined with Seidman's $45,000 and used solely for the purchase of the cocaine, with Seidman to later repay Cucci $30,000 to cover the $15,000 loan and $15,000 for the car. That agreed, the two men traveled in separate cars to Cucci's cabin, located a few miles away from town, to make the exchange. Seidman's money was prerecorded and he was wired with a recording and monitoring device.
 
 
 6
 As they entered the cabin, Seidman noticed an AK-47 rifle leaning against the wall, which Cucci told him was loaded. After a wait, Seidman saw a man walking down the road to the cabin. Cucci directed Seidman to turn around with his back to the window. After a few minutes, when Cucci said that it was all right for Seidman to turn back around, Seidman handed Cucci the prerecorded money and returned to his car to find the two kilograms of cocaine in the trunk. As Seidman drove away from the cabin, he passed the man he had seen approaching it. Talking into his monitoring device, he described the man as balding and wearing a light-colored shirt with sunglasses hanging from the V-neck of the shirt. This man was later identified as Joseph Covello.
 
 
 7
 Covello was arrested a short time later, traveling east on Interstate 64. A search of the van in which he was riding revealed a bag containing $39,637, of which $26,330 was from the prerecorded money, and $6,500 above the driver's side visor, of which $500 was prerecorded. In his wallet, Covello had a piece of paper on which calculations were scribbled, showing $30,000 broken down into different amounts next to different names. Cucci was arrested later the same day at his home; $3,800 in prerecorded funds were found in a dresser drawer.
 
 
 8
 A jury convicted both men, and the court sentenced Cucci to 170 months imprisonment and Covello to 188 months. Both the sentences were based on an offense level of 32, the district court having determined that five kilograms was the amount of cocaine involved in the conspiracy. The court enhanced Cucci's offense level by two for possession of a firearm during a drug offense, and Covello's by four, two for possession of a firearm and two for his role in the offense. Both defendants had a criminal history level of I.
 
 II
 
 9
 Cucci argues primarily that he was entrapped as a matter of law. He contends that he had no criminal record and was induced to commit the crime, never having dealt in drugs before.
 
 
 10
 It is fundamental that the government may not create the crimes it prosecutes by planting the idea of a crime in the mind of an innocent person and then inducing the commission of that crime. Accordingly, once the government does offer a defendant an opportunity to commit a crime, it must be prepared to show beyond a reasonable doubt that the defendant was predisposed to commit the crime. See Jacobson v. United States, 112 S. Ct. 1535, 1540 (1992). The district court refused to find that Cucci was entrapped as a matter of law, but did instruct the jury on the defense of entrapment. The jury found the defendant guilty and therefore, of necessity, that he was not entrapped. We review the jury's verdict by taking the evidence in the light most favorable to the government and determining whether any rational trier of fact could have found predisposition beyond a reasonable doubt. See United States v. Jones, 976 F.2d 176, 180 (4th Cir. 1992), cert denied, 113 S. Ct. 2351 (1993). Predisposition refers to a general state of mind. The government need not show that the defendant had specifically contemplated committing the charged crime, but only that the decision to undertake the criminal activity was his own, not the product of government persuasion. See United States v. Osborne, 935 F.2d 32, 37-38 (4th Cir. 1991); United States v. Hunt, 749 F.2d 1078, 1085 (4th Cir. 1984), cert. denied, 472 U.S. 1018 (1985). The government is not, therefore, required to show a past criminal record or other evidence of specific criminal activity. See United States v. Akinseye, 802 F.2d 740, 744 (4th Cir. 1986), cert. denied, 482 U.S. 916 (1987).
 
 
 11
 Rather it may show predisposition by showing that the defendant readily accepted the opportunity presented.
 
 
 12
 Cucci relies heavily on United States v. Jacobson, 112 S. Ct. 1535 (1992), where the Supreme Court applied the entrapment defense and reversed a conviction for knowingly receiving child pornography, determining that the government had failed to present sufficient evidence of predisposition. Over the course of two and a half years, government inspectors had sent Jacobson mailings, including catalogues and questionnaires from sham organizations and correspondence from a fictitious pen pal. After the repeated solicitations and inducements, Jacobson finally ordered a pornographic magazine from a government-created catalogue. The Court held that this campaign to get Jacobson to order illegal materials went too far. Id. at 1543; see also Sherman v. United States, 356 U.S. 369, 373-75 (1958) (reversing conviction where defendant only agreed to buy drugs for the informant, who he met through a drug rehabilitation program, after numerous requests and pleas).
 
 
 13
 The Jacobson case, however, is readily distinguishable. In this case, the government did not conduct a campaign of repeated requests that Cucci sell drugs. During the initial six to ten conversations with Cucci, no mention was made of drugs. Seidman testified that he first brought up the subject of drugs on April 22, 1991, and that Cucci expressed no reluctance in agreeing to help Seidman find a source for cocaine, only to actually handling the drugs himself. The government presented evidence that its offer was readily accepted, and therefore presented sufficient evidence to support a finding that Cucci had the necessary predisposition.
 
 
 14
 Both the government and Cucci direct this court's attention to events which took place after Cucci agreed to this drug deal. When the proof of predisposition depends on ready acceptance, however, the question is what state of mind the defendant possessed immediately before the offer was made. Therefore, evidence about conduct after the agreement is reached is relevant only to the extent it reveals the defendant's pre-offer state of mind. Thus, for example, while the evidence that Cucci supplied an unsolicited free sample of cocaine may cast some light on his initial predisposition, it is not determinative. Similarly, Cucci's expressions of reluctance while he continued with the criminal activity after April 22 do not require a finding of entrapment as a matter of law. This evidence of subsequent conduct may be relevant to the issue, and the jury did consider it in determining whether Cucci was entrapped. Cf. Jones, 976 F.2d at 180 (jury could conclude defendant's statements showed rationalization or posturing). At bottom, however, the campaign central to the holding in Jacobson is not present in the case before us and a rational trier of fact could conclude that Cucci did readily accept Seidman's offer.
 
 III
 
 15
 Covello's principal argument is based on the district court's exclusion of the testimony of his seventeen-year-old daughter, Lillian, which was offered to explain why he had over $40,000 in his possession, including almost $27,000 in prerecorded funds. She was prepared to testify that Cucci had previously loaned Covello money and that Covello had travelled to Covington to borrow more. The court excluded her testimony on the basis that it was hearsay. Covello argues that Lillian's testimony was not hearsay, and that if it was hearsay, to the extent she would testify to statements made by Covello, her testimony was admissible under the exception in Rule 804(b)(3) for statements against interest made by an unavailable declarant. We find neither argument persuasive.
 
 
 16
 Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). That was precisely the purpose of the evidence excluded. Lillian's testimony was offered to establish as true that the money found on her father at the time of his arrest was the proceeds of a loan from Cucci. This situation is distinguishable from one in which someone takes action based upon the statements of another. If Lillian had traveled to Covington because her father told her that he was taking out a loan from Cucci and wanted her to go pick up the money, then the statements could be offered to explain her actions. See United States v. Love, 767 F.2d 1052, 1063-64 (4th Cir. 1985) (agent may testify about statements made by other officers which led him to arrest defendant as they were offered to explain the testifying agent's actions, not for their truth), cert. denied, 474 U.S. 1081 (1986). Here, however, Lillian would have testified about statements made by her father to explain his own actions.
 
 
 17
 Covello argues alternatively that these statements fit within an exception to the hearsay rule-that found in Rule 804(b)(3), allowing admission of statements against pecuniary interest when the declarant is unavailable. He contends that he was unavailable for the purposes of Rule 804 because he properly invoked the protection of the Fifth Amendment. See United States v. MacCloskey, 682 F.2d 468, 477 (4th Cir. 1982). We also reject this argument.
 
 
 18
 Rule 804 was not intended to allow a defendant to have the advantages of having his statements introduced at trial without the disadvantages of cross-examination and impeachment. See United States v. Bennett, 539 F.2d 45, 54 (10th Cir.), cert. denied, 429 U.S. 925 (1976). Nor does the text of Rule 804 contemplate allowing a defendant invoking the Fifth Amendment to admit his own statements under a hearsay exception. In defining unavailability, Rule 804(a) provides that "[a] declarant is not unavailable as a witness if [his unavailability] is due to the procurement or wrongdoing of the proponent of the statement for the purpose of preventing the witness from attending or testifying." While Covello obviously has engaged in no wrongdoing in declining to testify, he has procured the declarant's absence in the sense that whether or not he testifies is within his own control. If he wishes to give his own testimony, he must be prepared to submit to cross-examination. If he elects not to testify and asserts his Fifth Amendment privilege, he bears the consequences of not having his testimony before the jury. He cannot have it both ways.
 
 IV
 
 19
 Both defendants challenge the sufficiency of the evidence to convict them of conspiracy to distribute cocaine. Covello further challenges the sufficiency of the evidence that he was Cucci's source. We resolve the issue by viewing the evidence in the light most favorable to the government and determining whether any rational trier of fact could have found the elements of conspiracy to exist beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979). In determining whether the jury's verdict was supported by evidence of a conspiracy, we must consider whether there was sufficient evidence
 
 
 20
 Cucci and Covello conspired with each other. Seidman, who was a government informant, cannot be a coconspirator. See United States v. Giunta, 925 F.2d 758, 764-65 (4th Cir. 1991).
 
 
 21
 The defendants rely heavily on our opinion in Giunta in which we reversed the defendant's conspiracy conviction because the defendants simply agreed to help an undercover agent find a source of heroin. Although Giunta and another man, Fedino, apparently agreed to help an undercover agent find a source of heroin, neither represented that he could supply the drugs himself. The agent was never introduced to a source, and no drugs were ever produced. Id. at 761-63.
 
 
 22
 The defendants argue that the facts of this case are like those in Giunta. They argue that the fact that Cucci simply agreed to find Seidman a supplier does not show that Cucci and the supplier agreed to distribute cocaine. The argument fails, however, to take account of the evidence. Cucci did not simply agree to try to introduce Seidman to a willing seller. Rather, Cucci acted as the middleman, negotiated the deal between Seidman and the supplier, and orchestrated the July 25 sale of almost two kilograms of cocaine for $60,000, receiving a share of the proceeds.
 
 
 23
 Covello's argument that the evidence failed to implicate him similarly fails. Based on the descriptions Cucci gave of his source, a boyhood friend from Sicily who lived in Brooklyn, the agents had already begun to suspect Covello. On the day of the sale, Covello came to town from Brooklyn and met Cucci at the pizzeria. Covello was also seen walking to the cabin before the transaction and down the road just after. When he was arrested on Interstate Route 64, he met the description given by Seidman-a balding man, wearing a light colored shirt with sunglasses in the V of the shirt neck. This same man was also seen by several undercover agents who had followed Cucci and Seidman to the cabin. Two agents, in separate vehicles, each saw him walking away from the cabin toward the main road and later riding as a passenger in Cucci's car. A third agent saw Cucci and Covello return to the pizzeria, and saw the two men behind the restaurant. When Covello was arrested later the day of the sale, he had close to $27,000 in funds prerecorded for the deal. In light of the evidence, his argument has no merit.
 
 V
 
 24
 The defendants next contend that the government improperly failed to disclose to them evidence to impeach Seidman in accordance with its obligations under Giglio v. United States, 405 U.S. 150, 154 (1972). Specifically, the defendants argue that the government should have disclosed that it seized a loaded .38 caliber revolver from Seidman at the time of his arrest; that 140 doses of LSD, rather than 1520, were seized; that the charges against Elisabeth Seidman were dropped after Seidman entered his plea agreement; that Seidman had lied in connection with earlier arrests; and that Seidman filed two false financial affidavits, rather than just one.
 
 
 25
 The district court conducted an evidentiary hearing on the defense motions, and concluded that there was material which the government should have disclosed. The court proceeded to find, however, that the government had shown that the undisclosed information was available to the defendant from sources to which a reasonable defendant would turn. See United States v. Wilson, 901 F.2d 378, 380-81 (4th Cir. 1990). In addition, the court concluded that the defense had substantial opportunity to impeach Seidman during trial, and, while the undisclosed evidence would have made further impeachment possible, the evidence was cumulative and not sufficient to change the outcome of the trial. See United States v. Bagley, 473 U.S. 667, 682 (1985).
 
 
 26
 While it is nevertheless troubling when the government fails to comply with its discovery obligations, as the district court found in this case, we have no basis to conclude that the district court erred. We have reviewed carefully the undisclosed evidence, the testimony and cross-examination of Seidman, and the record as a whole, and we are satisfied that in the circumstances the district court did not abuse its discretion in denying a new trial.
 
 VI
 
 27
 Finally, Cucci and Covello contend that the district court erred in holding them responsible for five kilograms of cocaine, rather than two, in setting the base offense level for sentencing. In determining that five kilograms was the proper amount, the district court proceeded under United State Sentencing Guideline Sec. 2D1.4 which provided, "If the defendant is convicted of an offense involving negotiation to traffic in a controlled substance, the weight under negotiation in an uncompleted distribution shall be used to calculate the applicable amount."* Under the facts of this case, we find no error in the district court's use of five kilograms. See United States v. Brooks, 957 F.2d 1138, 1151 (4th Cir.) cert denied, 112 S. Ct. 3051 (1992).
 
 
 28
 Here, the district court found that Cucci and Covello agreed to provide Seidman with five kilograms of cocaine as part of their deal and that the defendants both intended to and were capable of producing that quantity. These findings are not clearly erroneous. When asked, Seidman told Cucci he would buy four or five kilograms a month. Cucci later reported back to Seidman that his source might not be able to get five kilograms at one time, but one or two could be done, although at one point Cucci indicated there might be five kilograms brought down for the first deal. Seidman said he would not expect to pay more than $25,000 per kilogram if he were buying five kilograms every thirty days. Two kilograms were in fact obtained for the sale on July 25. In addition, after the July 25 sale, Cucci indicated to Seidman that the terms of the deal would change in the future, with Seidman paying the money up front.
 
 VII
 
 29
 Finally, Covello contends that the district court erred in enhancing his base offense level by four, two levels for role in the offense and two levels for possession of a firearm. Again, the district court's findings are supported by the evidence.
 
 
 30
 Evidence supported a finding that Covello controlled the negotiations. Throughout the negotiations between Seidman and Cucci, Cucci made it clear that final decisions were being made by his supplier in New York. In addition, the scribbled calculations found in Covello's wallet tend to show he would get a larger share of the profits. This evidence supports the court's finding that Covello was "an organizer, leader, manager, or supervisor" pursuant to Guideline Sec. 3B1.1(c). See United States v. Kincaid, 964 F.2d 325, 329 (4th Cir. 1992) (enhancement for role in the offense appropriate when coconspirator acted at the defendant's direction).
 
 
 31
 The increase of two levels under Guideline Sec. 2D1.1(b)(1) for possession of a firearm during the commission of an offense is based on the AK-47 which was in the cabin during the July 25 sale. Covello is liable for the reasonably foreseeable acts of his coconspirator undertaken in furtherance of the conspiracy. See United States v. Cummings, 937 F.2d 941, 944 (4th Cir.), cert. denied, 112 S. Ct. 395 (1991); United States v. White, 875 F.2d 427, 433 (4th Cir. 1989).
 
 
 32
 For the reasons given, the judgments of the district court are affirmed.
 
 AFFIRMED
 
 33
 HALL, Circuit Judge, concurring in the judgment in part and dissenting in part:
 
 
 34
 I concur in the court's judgment affirming the appellants' convictions and join parts I-V and VII of the majority's opinion. However, because I believe that the district court erred when it sentenced the appellants as if they had agreed to distribute five kilograms of cocaine, I would vacate appellants' sentences and remand for resentencing. Accordingly, I respectfully dissent from the holding in Part VI of the majority opinion.
 
 
 35
 There are only two scenarios that could support the district court's factual finding that the appellants "intended[to distribute five kilograms of cocaine] as part of their deal with Mr. Seidman"-either the appellants agreed to sell more than two kilograms at the initial sale (and for some reason failed) or they agreed to sell the additional cocaine in future transactions.[1] Neither of these premises is supported by the record.
 
 
 36
 Once Seidman ascertained that Cucci could arrange a cocaine sale, the two began negotiating. These negotiations were conducted through furtive, coded telephone conversations, and, because Cucci was acting as an intermediary for Covello and lacked authority to set the deal's terms, were ultimately inconclusive. Although Cucci and Seidman frequently discussed a five-kilogram sale, these discussions were nothing more than preliminary negotiations. Cucci and Seidman never set a date for a five-kilogram transaction, never agreed upon the location, never agreed upon the method of transfer, and most importantly, never set the final price.
 
 
 37
 Eventually, Cucci and Covello agreed to the July 25, 1991, transaction, although its details remained hazy. Of course, we now know that Covello attempted to deliver approximately two kilograms of cocaine. However, up until the morning of July 25, when Cucci determined that Covello was bringing two kilograms of cocaine, Cucci, Seidman and the government investigator in charge of the operation thought that the sale would involve only one kilogram.
 
 
 38
 Because there is no evidence that the parties intended the initial sale to encompass more than two kilograms, the district court's fivekilogram finding must fall unless Cucci and Seidman reached an agreement concerning the terms of future narcotics sales. If Cucci and Seidman had negotiated these future sales with a sufficient degree of certainty, this would be an easy case. Under U.S.S.G. Sec. 2D1.4, comment. (n.1) (Nov. 1991) (subsequently moved to U.S.S.G. Sec. 2D1.1, comment. (n.12) (Nov. 1992)), the district court should look to the "negotiated amount," and, unless the defendant did not intend to produce this amount and was not capable of producing this amount, it must be counted for sentencing purposes. See United States v. Brooks, 957 F.2d 1138, 1150-51 (4th Cir.), cert. denied, 112 S.Ct. 3051 (1992).
 
 
 39
 In my opinion, the government failed to prove by a preponderance of the evidence that the parties reached a specific agreement about future sales. Admittedly, there was a vague understanding that, if this deal were mutually satisfying, the parties could continue to do business. However, no agreement was reached regarding quantity, price, time of sale, or the other elements of the deal that would allow the district court to make a finding that Cucci and Covello intended to distribute "x kilograms" of cocaine. In fact, the district court's five kilogram finding could just as easily have been three kilograms (the next shipment could have been the one kilogram shipment Seidman expected on July 25), twenty-four kilograms (Cucci and Covello could have distributed two kilograms a month for a year), fifty to one hundred kilograms (an amount casually mentioned by Cucci during a wiretapped phone conversation),[2] or any other number the district court settled upon (why not?). My point is that a court cannot rationally predict the amount of cocaine that a conspiracy will distribute in future transactions when the parties have yet to negotiate the future transactions. And by its own terms, Sec. 2D1.4, comment. (n.1) does not apply unless a member of the conspiracy has agreed upon the "negotiated amount" to be distributed.
 
 
 40
 Because I believe that the district court committed clear error when it ascribed five kilograms to the conspiracy for sentencing purposes, I respectfully dissent from the affirmance of the appellants' sentences.
 
 
 
 *
 Although Sec. 2D1.4 has been deleted from the Guidelines, the same language concerning unconsummated transactions has been added to the commentary to Sec. 2D1.1 at note 12
 
 
 [1]
 The district court did not explain which of these two premises its five kilogram finding was based upon
 
 
 [2]
 But see United States v. Ruiz , 932 F.2d 1174, 1182-84 (2d Cir.) (defendant's casual reference to a specific quantity of narcotics did not constitute negotiation of a specific drug transaction), cert. denied, 112 S.Ct. 151 (1991)