**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Lautaro CEA, Defendant–Appellant.**

No. 91–1492.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 19, 1991.

Decided May 14, 1992.

---

Barry R. Elden, Asst. U.S. Atty., Criminal Receiving, Appellate Div., Chicago, Ill., Diane MacArthur (argued), Chicago, Ill., for plaintiff-appellee.

Sidney I. Schenkier, Jerold S. Solovy, Daniel Lynch (argued), Jenner & Block, Chicago, Ill., for defendant-appellant.

Before COFFEY and EASTERBROOK, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

COFFEY, Circuit Judge.

Lautaro Cea was convicted of conspiring to possess cocaine with intent to distribute, attempting to possess cocaine with intent to distribute, and using the telephone to facilitate a controlled substance offense. 21 U.S.C. §§ 841(a)(1), 846, and 843(b). The district court sentenced Cea to 109 months in prison, but on appeal this court reversed the attempt conviction and remanded for resentencing. *United States v. Cea*, 914 F.2d 881, 888–89 (7th Cir.1990) ("*Cea I*"). On remand the district court sentenced Cea to 105 months in prison, and he now appeals that sentence, alleging that the district court (1) erred in holding him accountable for ten kilograms of cocaine when he only had the intent to buy one, (2) erroneously refused to classify him as a "minor participant" in the conspiracy and reduce his offense level under § 3B1.2(b) of the Sentencing Guidelines, and (3) considered improper factors in giving him a longer sentence than his co-conspirator. We affirm.

## BACKGROUND

In January of 1988 Francisco Medina, a confidential informant posing as a drug trafficker, and Carlos Hevia, a lieutenant with the Illinois State Police, began a "reverse buy"[1] sting operation in Chicago. Before coming to Chicago, Medina had contacted Cea, an old acquaintance, regarding the sale of a large quantity of cocaine. Once in Chicago Medina called Cea, who came to Medina's hotel to discuss the cocaine transaction. Medina explained that he had a friend (Lt. Hevia) who was bringing up a large load of cocaine from Miami, and that he needed to find a buyer for it. Cea agreed to participate in buying twenty kilograms of cocaine at $12,000 each. He did not have the money himself to buy the cocaine; his role was to link up with someone who did. He found that person the next day, a jewelry store owner named Eduardo Quinto, who agreed to provide the money for the transaction.

On the following day, January 21, 1988, Cea called[2] Medina to tell him that he had found a buyer, and that the buyer wanted the sale to take place at his (Cea's) house. Lt. Hevia, posing as the cocaine supplier, would not agree to that location. This dispute over the site of the transaction became a major sticking point in the negotiations; even after numerous phone calls and meetings, neither side would budge from its original position. The problem

---

[1]. A "reverse buy" scheme is one where the government attempts to sell a controlled substance rather than buy it.

[2]. All of the conversations and phone calls between Cea and Quinto and Medina and Lt. Hevia were recorded, except for the final conversation between Cea and Lt. Hevia on January 22, 1988.

seemed to be a mutual lack of trust—Lt. Hevia did not want to conduct the transaction in strange surroundings and without electronic surveillance, and Cea and Quinto were afraid that doing the deal anywhere but at Cea's house would increase their risk of being robbed or arrested. Various plans were proposed to erase these fears, such as beginning with a smaller transaction and then, if all went well, selling the rest of the twenty kilograms. After much negotiation, the parties agreed to conduct the deal in stages, with Medina and Lt. Hevia first delivering ten kilograms of cocaine to Quinto and Cea at Cea's house. Then, if Quinto and Cea were satisfied with the quality of the drugs, they would buy the other ten kilograms a few days later. The first delivery was to occur on the evening of January 21, 1988, but Medina and Lt. Hevia decided that going to Cea's house would be too dangerous and called it off, excusing themselves to Cea and Quinto by claiming that they had seen a "detective car" near Cea's house.

On the next night, January 22, 1988, Lt. Hevia called Cea and suggested a different arrangement, whereby he would deliver one kilogram of cocaine to Cea, and if things went smoothly he would deliver the rest of the first ten kilograms in a few hours. As before, though, Quinto insisted that everything take place at Cea's house, a condition to which Lt. Hevia refused to agree. Cea then became fed up with all of the haggling and called Medina (he refused to negotiate further with Lt. Hevia at that time) to tell him that the site of the deal was non-negotiable, and that he had to "take it or leave it." Medina replied "No, it won't be that way," and things seemed to be at a standstill. But Lt. Hevia was not about to chalk this whole operation up to experience. A few hours later he called Cea from a pay phone at a 7–Eleven near Cea's house. He told Cea that he was nearby with the kilogram of cocaine he had promised, and asked him to come to the store to pick it up. At first Cea tried one last time to convince Lt. Hevia to come to his house, but when Lt. Hevia refused he agreed to meet him at the store. Ten minutes later, Cea left his house and was immediately arrested. Quinto was arrested that same evening, and found to be in possession of $109,000 cash. This was close to the amount the parties had agreed on for the initial ten-kilogram sale.

Cea was convicted of conspiring to possess cocaine with intent to distribute, attempting to possess cocaine with intent to distribute, and using the telephone to facilitate a drug offense. 21 U.S.C. §§ 841(a)(1), 846, and 843(b). The district court computed his sentence under the Sentencing Guidelines. It found that his offense level was 32, but took off two levels for his acceptance of responsibility. U.S.S.G. § 3E1.1. Thus, the proper offense level was 30, meaning that the appropriate Guideline range for Cea's sentence was 97 to 121 months. The court settled on a 109 month sentence.[3] Quinto, who had pled guilty, was in the same sentencing range as Cea but received only 97 months. The court explained this disparity as being due to Quinto's relatively inactive role in the conspiracy, the government's recommendation for a minimum sentence, his promise to cooperate with the government, and the fact that he forfeited the $109,000 cash he had at the time of his arrest, along with half the assets of his jewelry store. 21 U.S.C. § 853(a). Cea, in contrast, had committed the same crimes as Quinto, but did not have any mitigating factors in his favor. Cea appealed his conviction and sentence, and this court reversed the attempt conviction and remanded for resentencing. *Cea I*, 914 F.2d at 889.

On remand the district court calculated Cea's sentence *de novo*, considering supplemental Presentence Reports and evidence of Cea's good conduct in prison. In determining the offense level, the court relied on its finding that Cea was reasonably capable of purchasing ten kilograms of cocaine. Specifically, the court noted Quinto's possession of the cash to buy ten kilograms, that the parties had negotiated to sell ten kilograms, and that the proposed one-kilo-

---

**3.** Actually, Cea received concurrent 109–month sentences on the conspiracy and attempt counts, and concurrent 48–month sentences on the use of the telephone counts.

gram transaction was only a stepping stone toward the ten-kilogram deal. Accordingly, Cea's offense level was 32. U.S.S.G. § 2D1.1(a)(3). The court reduced this by two points for Cea's acceptance of responsibility, giving him an offense level of 30, the same as before. Although Cea sought a two-point reduction for being a "minor participant" in the scheme under Guidelines § 3B1.2(b), the court refused, citing his "very vigorous actions in connection with this case," and noting that his role in the offense had been far from minor. Cea did not come away empty-handed, however, as the court reduced his sentence to 105 months in view of his exemplary conduct in prison (receiving his GED and dramatically improving his English proficiency). Although this was still eight months longer than Quinto's sentence, the court once again found the difference justified by Quinto's cooperation with the government and forfeiture of substantial assets.

## ISSUES

Cea challenges his sentence on three grounds. First, he argues that he should only have been sentenced on the basis of his intent to buy one kilogram, not ten, because the ten-kilogram deal had been abandoned at the time of his arrest. Second, he claims he was entitled to "minor participant" status under § 3B1.2(b) of the Guidelines, and so should have received a two-point reduction in his offense level. Finally, he contends that the district court abused its discretion in giving him a longer sentence than Quinto, as this effectively penalized him for lacking any assets to forfeit to the government and for exercising his right to trial instead of pleading guilty.

## DISCUSSION

Cea initially argues that the district court erred in holding him accountable for ten kilograms of cocaine when, at the end of all the negotiations, he only had the intent to buy one kilogram. He claims that he abandoned the ten-kilogram deal completely on January 22 when he and informant Medina could not agree on the location for the initial one-kilogram transaction and he said his goodbyes to Medina in no uncertain terms.

CEA: I already told you. If you want, bring [the kilogram of cocaine] over here. They'll look at it here. (Pause) And I'll give you the money. (Pause) Take or leave it.

MEDINA: No, it won't be that way.

CEA: Well then, it wasn't even a pleasure seeing you, man.

MEDINA: Damn ...

CEA: Some day we'll run into each other then. Okay.

MEDINA: Okay.

CEA: Okay.

MEDINA: Fine, thank you. Bye.

Appellant's Supp.App., at 35. According to Cea this discussion terminated any possibility of completing the ten-kilogram sale, and his later agreement to buy one kilogram of cocaine from Lt. Hevia was an entirely new transaction, unrelated to all of the earlier negotiations. Thus, he concludes, he should only be sentenced on the basis of his intent to buy one kilogram.

A sentencing court's conclusion as to the amount of cocaine involved in an offense is a factual finding, reviewed under the clearly erroneous standard. *United States v. Buggs*, 904 F.2d 1070, 1078 (7th Cir.1990). The first Application Note to Guidelines § 2D1.4 tells a court how to calculate the amount of drugs for which a defendant may be held responsible when the arrest comes before the transaction is complete.

If the defendant is convicted of an offense involving negotiation to traffic in a controlled substance, the weight under negotiation in an uncompleted distribution shall be used to calculate the applicable amount. However, where the court finds that the defendant did not intend to produce and was not reasonably capable of producing the negotiated amount, *the court shall exclude from the guideline calculation the amount that it finds the defendant did not intend to produce and was not reasonably capable of producing.*

U.S.S.G. § 2D1.4, comment. (n. 1) (emphasis added). Cea relies on the emphasized portion of this Application Note as support for his claim that he should only be held responsible for the one kilogram of cocaine he intended to buy at the time of his arrest. We disagree. The purpose of this Application Note is to prevent a defendant from being sentenced on the basis of idle boasts or braggadocio rather than for the amount of contraband he actually intended to produce or buy and was reasonably able to produce or buy. For example, in *United States v. Ruiz*, 932 F.2d 1174 (7th Cir. 1991), the defendant conspired to sell two kilograms of cocaine, but brought only one to the transaction. When the buyer (an undercover agent) became upset at this shortfall, Ruiz said, "It doesn't matter. I'll get you the other kilo. And, if you want, even ten more I can get." *Id.* at 1177. The district court calculated Ruiz's offense level under § 2D1.4, and held him responsible for ten kilograms, not two. We reversed on this point, holding that Ruiz should only be held responsible for the two kilograms because no evidence established that the conspiracy's goal was to sell ten kilograms: there were no buyers for such an amount, no price had been set or discussed for such an amount, and there was no evidence that Ruiz had access to that much cocaine. The panel went on to discuss the dangers of placing too much emphasis on off-the-cuff statements of defendants.

> And how much, really, can be made of Ruiz's comment? "Even ten more I can get" is hardly the negotiation of a specific drug transaction. If so, then had Ruiz said "I can get you tons more," or even "I can get you all the cocaine in Colombia," he could have been held accountable for those amounts—a result that could not have been intended by Guidelines §§ 1B1.3 and 2D1.4.
>
> Standing alone, as it does here, an offhand statement referring to larger quantities of narcotics that amounts to no more than braggadocio is insufficient

to establish that those quantities were "under negotiation" as envisioned in Guidelines § 2D1.4(a).

*Id.*, at 1184; *see also United States v. Moon*, 926 F.2d 204, 208–10 (2d Cir.1991); *United States v. Foley*, 906 F.2d 1261, 1264–65 (8th Cir.1990) (both reversing sentences based on amounts of cocaine that had been mentioned in passing, rather than specifically negotiated).

In contrast to *Ruiz*, Cea was not sentenced on the basis of idle boasts. Overwhelming evidence reveals that he had both the intent and the ability to carry out his plans to buy ten kilograms of cocaine. First of all, his co-conspirator had $109,000 in cash at the time of his arrest, meaning that Cea, through Quinto,[4] definitely was capable of purchasing all ten kilograms. Second, his intent to do so is demonstrated by his very specific negotiations as to price and amount, carried out over a recorded series of phone calls and meetings. More, he was willing to use his home to conduct the transaction. In other words, Cea was not shooting the breeze with the agents or randomly proposing hypothetical future transactions; he was dead serious about buying and distributing ten kilograms of cocaine and, through Quinto, had the means to do it. Our cases make it clear that a defendant will be held responsible for the full amount of the drugs he earnestly negotiates to buy or sell. In *United States v. Macias*, 930 F.2d 567 (7th Cir. 1991) the defendant arranged to sell eight kilograms of cocaine to an informant, but only delivered five. We upheld the district court's sentence based on the full eight kilograms because the defendant negotiated to sell that amount and had both the wherewithal and the intent to do so. *Id.* at 570. Likewise, in *United States v. Buggs*, 904 F.2d 1070 (7th Cir.1990) the defendant actually sold less heroin and cocaine than he had negotiated to sell, but was properly sentenced for the full negotiated amount, not just the amount sold. *Id.* at 1078–79. *See also United States v. Boyer*, 931 F.2d

---

**4.** Quinto's possession of the money may be used as proof of Cea's ability to buy the cocaine because, as co-conspirators, they are each held accountable for the reasonably foreseeable acts of the other. U.S.S.G. § 1B1.3, comment. (n. 1).

1201 (7th Cir.1991); *United States v. Alvarez–Cardenas*, 902 F.2d 734, 736 (9th Cir. 1990) ("the offense level for a conspiracy is determined by the amount that a defendant conspired to sell and not by the amount ultimately sold."). There was no reason to hold Cea accountable for anything less than ten kilograms of cocaine; he negotiated to buy that amount and had the means to do so. Thus, the district court properly calculated his offense level.[5]

■ Cea next argues that the district court should have deducted two points from his offense level because he was a "minor participant" in the conspiracy. This claim stems from Guidelines § 3B1.2(b), which directs courts to decrease a defendant's offense level by two if the defendant was only a "minor participant" in the criminal activity. A "minor participant" is "any participant who is less culpable than most other participants, but whose role could not be described as minimal." U.S.S.G. § 3B1.2, comment. (n. 3). The district court refused to apply § 3B1.2(b) to Cea, noting that "the transaction could not have taken place but for Mr. Cea and his very vigorous actions in connection with this case," and that "[s]o far as activities and arrangements and the but-for test of causation, [Cea was] perhaps the major participant [in the conspiracy]." Appellant's App., at 34. Cea, however, maintains that the court applied the wrong legal standard in denying him "minor participant" status because it focused on his *activities* in connection with the scheme, rather than his relative degree of *culpability*. Determinations under § 3B1.2 depend greatly upon the particular facts of each case, and so we review the district court's decision for clear error. *United States v. Davis*, 938 F.2d

744, 747 (7th Cir.1991); *United States v. Miller*, 891 F.2d 1265, 1270–71 (7th Cir. 1989).

Cea is correct when he asserts that a defendant's relative degree of culpability is the key factor under Guidelines § 3B1.2(b). *See United States v. Osborne*, 931 F.2d 1139, 1159 (7th Cir.1991). Regardless of this fact, however, Cea's argument that the district court erred by examining his activities rather than his culpability cuts things too finely. A court cannot determine a defendant's culpability by referring to some abstract metaphysical standard; it must look to the defendant's activities and the role he played in the conspiracy. *See Osborne*, 931 F.2d at 1157–59; *United States v. Brick*, 905 F.2d 1092, 1095 (7th Cir.1990). Indeed, it would seem impossible to determine culpability without a significant focus on the defendant's activities, especially in comparison to the acts of co-conspirators. We therefore hold that the district court followed the proper course and applied the proper legal standard when it viewed Cea's activities in the scheme as indicators of his relative culpability, noting their importance to the scheme's potential success.

The issue, then, is whether the court committed clear error in applying this standard. We hold it did not. After hearing the facts and reviewing the evidence, the court found it "absolutely clear [that] Mr. Cea did not have a minor role in this case." Appellant's App., at 34. Substantial evidence in the record supports this finding. Cea contacted Quinto when undercover informant Medina asked him to locate a buyer for several kilograms of cocaine. He spoke for Quinto during the negotiations

---

5. In addition, it appears that Cea has *already* received the benefits of § 2D1.4's Application Note 1. Guidelines § 2D1.4 provides that in sentencing conspirators, "the offense level shall be the same as if the object of the conspiracy or attempt had been completed." The object of this conspiracy was to purchase twenty kilograms of cocaine; smaller sales were only discussed as a means to complete the larger deal. Reading § 2D1.4 literally, then, Cea could have been sentenced on the basis of twenty kilograms. Yet, because the evidence demonstrated that Quinto had only $109,000, roughly the

amount negotiated for the ten-kilogram sale, the court found that Cea was only reasonably capable of purchasing ten kilograms and sentenced him on that basis. This is the result contemplated by Application Note 1 to § 2D1.4: a defendant will be sentenced only for the amount of drugs he intends to and is reasonably able to buy or produce, not some amount merely mentioned in passing. Thus, Cea has already received all the benefit he can expect from Application Note 1, and his attempt to squeeze more from it asks too much.

and, as the district court put it, "No one could have tried any harder than Cea to culminate the deal" by persistently haggling over the details with informant Medina and Lt. Hevia in hopes that some transaction would occur. He also met personally with Medina and Lt. Hevia and offered his house for completing the transaction. Given his deep commitment to the conspiracy and his importance to its potential success, Cea cannot be characterized as a less culpable "minor participant" under § 3B1.2(b).

We have reached the same conclusion in cases with similar facts. For example, in *Brick* we denied a "minor participant" adjustment where the defendant, like Cea, was the go-between for undercover agents and a co-conspirator, negotiating drug transactions by phone and personally meeting with the agents at each of the deals. Though he only received small sums of money for his assistance in arranging the sales, Brick did not qualify as a "minor participant" because he had played a key role in the scheme.

> Individuals can play different but integral roles in drug transactions. Brick played an integral role by linking the seller to the buyer, that is, by serving as Voigt's agent when dealing with the undercover agents. *A person who directs a buyer to a seller cannot be considered a minor participant because that person also plays an important role in the distribution of the drugs.*

*Id.* (emphasis added); *see also United States v. Boyer*, 931 F.2d 1201, 1205 (7th Cir.1991) (no § 3B1.2 adjustment where the defendant pursued a buyer and put him in contact with an undercover seller in a "reverse buy" drug sting); *Osborne*, 931 F.2d at 1159 (denying § 3B1.2 adjustment where defendant drug courier made two trips from Florida to Wisconsin, transporting a total of eleven ounces of cocaine; in doing so he performed an indispensable role for the operation, and could not claim to be substantially less culpable than other conspirators); *United States v. Tholl*, 895 F.2d 1178, 1186 (7th Cir.1990) (denying § 3B1.2 adjustment even though the defendant had neither conceived the scheme nor played

the most active role; his significant participation in the two-person conspiracy and his "culpable desire to profit from the scheme" were enough). Thus, even though Cea claimed he was only working for a "commission" and may have had less to gain from the scheme than Quinto, his participation in locating Quinto as a buyer and conducting the negotiations demonstrates that he was not appreciably less culpable than his co-conspirator and did not deserve a "minor participant" adjustment. Accordingly, we hold that the district court did not commit clear error in refusing to reduce his offense level under § 3B1.2(b).

■ Cea's third claim asks us to compare his sentence to Quinto's. Both defendants faced the same sentencing range (97–121 months), yet Cea received 105 months while Quinto got only 97. Cea argues that this disparity is the result of the district court's reliance on unconstitutional factors in affording Quinto more leniency, namely that Quinto pled guilty and forfeited substantial funds to the government. By taking these facts into account when sentencing Quinto, Cea contends, the district court effectively punished him for exercising his right to trial and for his lack of funds to forfeit. Conveniently for us, Cea made the exact same argument on his first appeal to this court, and we rejected it, declaring that "the defendant's disparity of sentence argument is eclipsed by the district court's imposition of a sentence within the correct guideline range." *Cea I*, 914 F.2d at 889. Because the law on this point has not changed since *Cea I*, and his sentence is still within the correct Guideline range, we adhere to our prior decision. *See United States v. Edwards*, 945 F.2d 1387, 1398 (7th Cir.1991) ("If the sentence imposed upon a particular defendant falls within the applicable Guideline [range], then it will not be overturned on the ground that another defendant was sentenced differently."); *United States v. Smith,* 897 F.2d 909, 911 (7th Cir.1990) ("Nothing in [18 U.S.C. § 3742(e)] allows review of a sentence imposed in conformity with the Guidelines on grounds that a codefendant was treated

differently."). Thus, there is nothing for us to review.

## CONCLUSION

Cea has failed to convince us that the district court improperly calculated his offense level or his sentence. He has also failed to raise any new argument as to the disparity between his and Quinto's sentences. Accordingly, the district court's decision is

AFFIRMED.