**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Leslie CRAWFORD, Defendant–Appellant.**

**No. 92–2696.**

United States Court of Appeals, Seventh Circuit.

Argued March 3, 1993.

Decided April 23, 1993.

Andrew B. Baker, Jr., Asst. U.S. Atty., Dyer, IN (argued), Jennifer J. Sackett, law clerk (on brief), for U.S.

Jeffrey Kehl, South Bend, IN (argued), for Leslie Crawford.

Before POSNER and EASTERBROOK, Circuit Judges, and PELL, Senior Circuit Judge.

PELL, Senior Circuit Judge.

Defendant Leslie Crawford entered a plea of guilty to one count of possession with intent to distribute marijuana in violation of 21 U.S.C. § 841(a)(1). Defendant appeals from his sentence, contending that in determining the base offense level, the district court erred in attributing to him undelivered marijuana which was under negotiation between defendant's half-brother and a police informant. Defendant argues that the undelivered marijuana cannot be attributed to him because he was not convicted of conspiracy. He also maintains that the district court cannot consider marijuana which was non-existent.

## BACKGROUND

In "Operation Junior," the DEA focused on marijuana transported to defendant's half-brother, Ainsley Richards (nicknamed "Junior"), in New York. The investigation resulted in the indictment and conviction of 12 individuals, including defendant.[1]

In the 1980's, "Junior" Richards ran a thriving business of purchasing and receiving large quantities of marijuana in New York. The marijuana was usually delivered by Mike Rector and his four brothers. On September 26, 1988, defendant arrived in the United States from Jamaica, and began assisting his half-brother.

Mike Rector testified at the sentencing hearing on behalf of the government. He was arrested in December 1988, and agreed to cooperate with the government. He saw defendant assist in off-loading the marijuana for Richards at various times. Acting as an informant, Rector also spoke with defendant during recorded telephone conversations in February 1989, as part of the negotiations for a 736–pound shipment. Defendant sent Rector $7,000 as a partial payment on the 736–pound shipment.

Trifon K. Magrames, a DEA agent, testified regarding the five recorded telephone conversations made by Rector to Richards in February 1989. Defendant participated in all but one of the calls. Defendant would answer Richards' telephone, switchhook the call to Richards, making it a

---

1. Defendant was originally charged with ten counts, including one count of conspiracy to possess with intent to distribute marijuana [21 U.S.C. § 846]; four counts of possession with intent to distribute marijuana and aiding and abetting [21 U.S.C. § 841(a)(1), 18 U.S.C. § 2]; and five counts of communication violation and aiding and abetting [21 U.S.C. § 843(b), 18 U.S.C. § 2]. Pursuant to a plea agreement, the government dismissed nine counts, and defendant entered a plea of guilty to the remaining count of possession with intent to distribute marijuana [21 U.S.C. § 841(a)(1) ], and aiding and abetting [18 U.S.C. § 2].

three-way line, and intermittently exchange information with Rector when instructed to do so by Richards.

Defendant testified at the sentencing hearing that in Jamaica, he had been employed as a police officer. Six days after he arrived in the United States, defendant picked up the first load of marijuana for Richards. He testified that he did not realize that the load was marijuana until several days later. Defendant testified that between October 1988 and December 1988, he off-loaded at least five shipments, four of which came from Rector. Defendant earned a total of approximately $1,500 for his off-loading duties.

Defendant testified further that in February 1989 he set up several three-way telephone calls between Richards, Rector and himself, but he did not listen in on the calls. Nevertheless, during the conversations, defendant did hear Richards give him instructions to send money to Rector; however, defendant did not know that the money was for the purchase of marijuana.

The district court found that defendant had off-loaded at least five loads of marijuana, each weighing approximately 175 pounds, for a total of 875 pounds. The court added in the 736 pounds under negotiation, totalling 1,611 pounds (730.7 kilograms). In regard to the 736–pound sale, the district court noted that even if defendant had *not* been listening·on the telephone during the tape-recorded conversations, it was reasonably foreseeable to defendant that "this was a marijuana deal going down," and that this was part of the same course of conduct as the previous sales.

The court arrived at a base offense level of 30, and then granted a two-level reduction for acceptance of responsibility. The court declined to grant a further reduction under § 3B1.2 for minor or minimal participant. It then sentenced defendant to 78 months in prison, the minimum time applicable under the base offense level of 28, reasoning that although defendant was not a minor player (due to the fact that he was a regular off-loader and a messenger for Richards), there was no showing that de-

fendant shared greatly in the proceeds of the distribution network.

## DISCUSSION

On appeal, defendant argues that in determining the base offense level, the district court should have considered only the 875 pounds of marijuana contained in the five shipments which defendant off-loaded, and should not have considered the additional 736 pounds under negotiation.

██ Ascertaining the amount of drugs involved in an offense for sentencing purposes is a factual determination which will not be disturbed on review absent clear error. *United States v. Hoffman*, 957 F.2d 296, 300 (7th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 2315, 119 L.Ed.2d 235 (1992); *United States v. Buggs*, 904 F.2d 1070, 1078 (7th Cir.1990). The government must establish the quantity of drugs involved by a preponderance of the evidence. *United States v. Schuster*, 948 F.2d 313, 315 (7th Cir.1991).

Defendant first argues that it was unfair to sentence him for conspiratorial acts when the offense for which he was convicted does not include the elements of a conspiracy, *i.e.*, trafficking and conspiring.

██ Section 2D1.1 of the United States Sentencing Commission, Guidelines Manual [hereinafter U.S.S.G.] sets forth the base offense levels for narcotics offenses. The base offense level is determined by the amount of drugs included in the defendant's relevant conduct. In determining a base offense level, a sentencing court may attribute to defendant a quantity of drugs negotiated or sold by other persons. This is true even where defendant was either not charged with or not convicted of conspiracy. *United States v. Pollard*, 965 F.2d 283, 287–88 (7th Cir.1992); *United States v. Rodriguez–Luna*, 937 F.2d 1208 (7th Cir.1991); *United States v. Franklin*, 902 F.2d 501, 504 (7th Cir.), *cert. denied*, 498 U.S. 906, 111 S.Ct. 274, 112 L.Ed.2d 229 (1990); *United States v. Salva*, 902 F.2d 483, 488 (7th Cir.1990); *United States v. White*, 888 F.2d 490, 500 (7th Cir.1989); *United States v. Vopravil*, 891 F.2d 155, 158 (7th Cir.1989).

Guideline § 1B1.3(a)(2) provides that the "relevant conduct" which the sentencing court may consider includes "acts and omissions committed or aided and abetted by the defendant, or for which the defendant would be otherwise accountable, that occurred during the commission of the offense of conviction." Application Note 1 to Guideline § 1B1.3(a)(2) states further:

"In the case of criminal activity undertaken in concert with others, *whether or not charged as a conspiracy*, the conduct for which the defendant 'would be otherwise accountable' also includes conduct of others in furtherance of the execution of the jointly-undertaken criminal activity that was reasonably foreseeable by defendant.... Where it is established that the conduct was neither within the scope of the defendant's agreement, nor was reasonably foreseeable in connection with the criminal activity the defendant agreed to jointly undertake, such conduct is not included in establishing the defendant's offense level under this guideline." U.S.S.G. § 1B1.3, Application Note 1, effective November 1, 1989. (Emphasis added.)

 Thus, contrary to defendant's argument, it is not necessary that defendant be *convicted* of conspiracy to be held accountable for drugs negotiated, sold or bought by other persons.

The additional 736 pounds of marijuana, however, must be involved in acts which were part of the "same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2). The district court here specifically found that defendant's activities with Richards "were part of the same course of conduct as the offense of conviction, and accordingly, must be considered in determining the offense level."

In finding that the transactions are part of the same course of conduct or common scheme or plan, the court may consider whether similar parties were involved in each transaction, the geographical relationship, the temporal relationship, and any other relationship between the convicted offense and the relevant conduct. *United States v. Duarte*, 950 F.2d 1255, 1264–65 (7th Cir.1991), *cert. denied*, — U.S. —, 113 S.Ct. 174, 121 L.Ed.2d 120 (1992).

The parties to the late–1988 transactions underlying the possession conviction, and the parties to the February 1989 negotiations were the same (Rector, Richards, defendant); the geographical relationship was the same (Rector transporting marijuana to New York); and the temporal relationship was restricted to the few months after defendant came to this country and began assisting Richards. In finding the February 1989 negotiations were part of the same course of conduct as the earlier, consummated sales, the district court properly pointed to the fact that defendant had already met Rector four times, and each time he was delivering marijuana to Richards, "and there is no evidence that [defendant] had any inkling of any other relationship between Mr. Richards and Mr. Rector." Thus, the evidence supports the district court's finding that the negotiations for the additional 736 pounds of marijuana involved the same course of conduct as the offense of conviction.

 Furthermore, where defendant negotiates to sell more than he actually sells, the sentencing court may base its calculation on the amount negotiated if defendant intended to and was reasonably capable of completing the negotiations for that amount. U.S.S.G. § 2D1.4.[2] Application Note 12 to § 2D1.1 explains:

"In an offense involving negotiation to traffic in a controlled substances, the weight under negotiation in an uncompleted distribution shall be used to calculate the applicable amount. However, where the court finds that the defendant did not intend to produce and was not reasonably capable of producing the negotiated amount, the court shall exclude from the guideline calculation the amount that it finds the defendant did not intend to produce and was not reasonably capable of producing." U.S.S.G.,

**2.** Section 2D1.4 was recently deleted by consolidation with other guidelines effective November 1, 1992 (see U.S.S.G. Appendix C, amendment 447).

§ 2D1.1, Application Note 12, effective Nov. 1, 1992.[3]

The district court found that, notwithstanding the fact that Rector was acting as a government informant, "Richards was negotiating for the purchase of drugs that he believed could be delivered." The evidence supports this finding, and the record belies defendant's assertion that he knew nothing about the drug-related nature of the February 1989 negotiations.

In the first telephone call, made on February 1, 1989, defendant answered the telephone and switch hooked the call to Richards, making it a three-way line.

Defendant testified that he would answer the telephone at Richards' apartment when Richards was across the street at the candy store he owned. There was a three-way line between the incoming caller, the apartment and the candy store. Defendant would screen the calls and "switch hook" the call to the candy store. While Richards spoke with the caller, defendant's phone line at the apartment remained open. Defendant testified that he did "not really" listen in on the calls. He would know it was time to hang up the phone when Richards "would call [defendant] from the window from the candy store" across the street, yelling that defendant should hang up the phone. Richards told Rector he needed more than 150 pounds.

In the second telephone call, made on February 6, 1989, defendant again answered the telephone and switch hooked the call to Richards. Rector told Richards he could get 736 pounds of marijuana. They discussed the type of marijuana and how Richards could send money to Rector. Richards instructed Rector to "give my brother [defendant] the information—he's going to send [the money] off to you, tomorrow." As further details were discussed, defendant intermittently participated in the three-way phone call.[4]

In the third telephone call, made on February 7, 1989 at 4:30 p.m., defendant again answered Richards' telephone, and connected him to Richards. Rector said he needed more money before he could leave with the 736–pound load.

In the fourth telephone call, made ten minutes later, further arrangements were made to send $7,500 to Rector. Defendant again participated intermittently in the three-way telephone conversation. Defen-

---

**3.** Defendant was sentenced on July 8, 1992. Generally only the guidelines in effect at the time of sentencing are applicable (18 U.S.C. § 3553(a)(4)). Later amendments which the Sentencing Commission intended as clarification, however, may be relied upon even where the amendment occurs after sentencing. *United States v. Thompson*, 944 F.2d 1331, 1347 (7th Cir.1991), *cert. denied*, — U.S. —, 112 S.Ct. 1177, 117 L.Ed.2d 422 (1992); *United States v. Caicedo*, 937 F.2d 1227, 1234 (7th Cir.1991); *United States v. Fiala*, 929 F.2d 285, 290 (7th Cir.1991).

Section 2D1.1, Application Note 12 (eff. Nov. 1, 1992) was taken from § 2D1.4, Application Note 1 (eff. Nov. 1, 1989), which referred to situations where "defendant is *convicted* of an offense involving negotiation to traffic...." The 1992 commentary, however, states that the amendment, which deletes any reference to conviction (consistent with § 1B1.3, Application Note 1), is only meant to clarify and simplify the guideline provisions dealing with attempts and conspiracies. U.S.S.G. § 2D1.4, Appendix C, amendment 447 at p. 271 (1992).

**4.** The transcript and cassette tape of the conversation indicate that defendant was listening during the entire conversation. For example, Richards would instruct defendant (without yelling out the window to the apartment across the street), to "take the information," and defendant knew what "information" Richards was referring to:

> "[RECTOR]: Give me about a half ounce of that 'snow' out there, too so I ...
> [RICHARDS]: No problem. When you come, we talk about that, OK?
> [RECTOR]: OK, OK.
> [RICHARDS]: Ali? [Defendant's nickname.]
> [DEFENDANT]: Yah, yah.
> [RECTOR]: Alright. Take the information from him.
> [DEFENDANT]: Yah.
> [RICHARDS]: [unintelligible] Right?
> [DEFENDANT]: Yah.
> [RICHARDS]: Take the information, give him your name.
> [DEFENDANT]: Yah.
>
> \* \* \* \* \* \*
>
> [RICHARDS]: Yah. They're going to send [the money] out by ten o'clock, OK?
> [RECTOR]: OK.
> [RICHARDS]: OK.
> [RECTOR]: Ali.
> [DEFENDANT]: Yah.
> [RECTOR]: OK. Here's the way I want you to put it, OK?"

dant then wired Rector $5,000 in defendant's name, and $2,500 in the name of a woman.

The recorded telephone calls sufficiently established defendant's participation in the negotiations for the purchase of the 736 pounds of marijuana.

Defendant next argues that it would be wrong to attribute the 736 pounds to him because it was imaginary, and thus posed no threat of harm to the general public.

The notion that the United States government could not obtain and deliver 736 pounds of marijuana in order to consummate an undercover operation is absurd. Notwithstanding the government's ability to deliver the marijuana, the DEA is certainly not forced to choose between permitting the drugs to be delivered or foregoing the conviction and sentence. We addressed a similar concern in *White:*

> "If investigatory agencies can secure higher sentences by allowing drugs to be delivered despite detection, they will be tempted to do this, creating a risk that larger flows will reach consumers if the 'controlled delivery' becomes uncontrolled and the drugs disappear." *White,* 888 F.2d at 498.

Moreover, the DEA, as seller or buyer, need not actually intend to produce the drugs or the money promised to defendant during negotiations carried out in an undercover operation. The fact that defendant made a down payment for a drug deal he would never successfully close is not relevant. "The Guidelines treat success and failure, conviction and no conviction, alike in drug cases, so long as the amounts are ascertainable." *White,* 888 F.2d at 499.

Defendant's argument attempts to create a flip side to the principle that a defendant should not be sentenced on the basis of idle boasts or braggadocio rather than for the amount of contraband he actually intended to produce or buy and was reasonably able to produce or buy. *United States v. Cea,* 963 F.2d 1027, 1031 (7th Cir.), *cert. denied,* — U.S. —, 113 S.Ct. 281, 121 L.Ed.2d 208 (1992). To be sure, there are limitations on the government's conduct in an undercover operation, as discussed be-

low. However, the factors of idle boasts and braggadocio have little, if any, relevance when we focus our examination on the government's conduct. We are not concerned that a government agent or cooperating witness will boast that he has, *e.g.,* 500 pounds of marijuana to sell, when he actually has none. The focus of the inquiry is on *defendant's* intent and ability to produce or buy, not the government's actual, subjective intent to consummate the sale.

Defendant also maintains that sentencing him for nonexistent drugs "condones overreaching by zealous prosecutors and government agents" by permitting them either to "engage in a ruse to manufacture rather than detect crime," or "to use a ruse to get a stiffer sentence." Defendant hypothesizes:

> "Under the district court's order, a DEA agent could tape record telephonic negotiations with a defendant under which the agent offers to sell 100,000 pounds of imaginary marijuana for a ridiculously low price knowing full well that the defendant's greed will lead to incriminating tape recorded evidence...."

The key is not that the drugs are "imaginary" or nonexistent, an argument we have already addressed. Instead, defendant's hypothetical points to the danger of the absence of any constraints on the government to not provoke an unknowing person into a drug transaction. *See United States v. Fowler,* 990 F.2d 1005 (7th Cir.1993). We share the concerns expressed by the Eighth Circuit:

> We have grave concerns that, in a case such as this, where the government conducts an undercover operation and (during the sale after which it knows an arrest will be made) makes a suggestion to the defendant about future sales, an intolerable avenue for abuse will be opened. While a defendant may be sentenced on the basis of uncharged conduct, that conduct must be his own (or where applicable that of a co-conspirator), not the government's conduct. We should not countenance allowing the gov-

ernment to manufacture conduct or negotiation without some evidence of knowing participation by the defendant in that conduct or negotiation. *United States v. Foley*, 906 F.2d 1261, 1264–65 (8th Cir. 1990).

A defendant should not be sentenced on the basis of a government agent's or cooperating witness' casual comment that he might be interested in buying or selling some contraband. The conversation must go beyond the casual comment if it is to establish defendant's intent and ability to consummate the sale. *See Cea*, 963 F.2d at 1031 (intent shown by specific negotiations as to price and amount carried out over a recorded series of phone calls; defendant not merely "shooting the breeze with the agents or randomly proposing hypothetical future transactions"); *United States v. Bradley*, 917 F.2d 601, 604 (1st Cir.1990) (rejecting defendant's argument that the drugs were just a "figment of his imagination").

Here, however, the government did not manufacture defendant's participation in the 1988 drug transactions. The 1988 completed transactions establish that defendant was not an unsuspecting or unwilling accomplice in Richards' drug ring. Defendant's admitted conduct in off-loading five shipments of marijuana was clearly "knowing participation." The 1988 conduct supports a finding that defendant's February 1989 conduct was also knowing participation.

Nor did the government manufacture the February 1989 detailed negotiations carried on over a seven-day period and numerous recorded telephone conversations. The government's cooperating witness, Rector, did not force a sale of an unusually large amount of marijuana at an unusually low price. *See United States v. Davern*, 970 F.2d 1490, 1498 (6th Cir.1992) (majority rejects defendant's argument that an undercover agent enticed him into buying more than he would have ordinarily purchased by offering "this great bargain price"), *cert. denied*, —— U.S. ——, 113 S.Ct. 1289, 122 L.Ed.2d 681 (1993). In fact, it was Richards (not the government's cooperat-

ing witness) who insisted that he needed more than 150 pounds of marijuana. As a result, Rector later reported that he had access to three carloads of marijuana totalling about 730 pounds. Richards instructed defendant to send enough money for two carloads, and instructed Rector to return for the third carload as soon as Richards could send the additional money. Defendant participated in these conversations and forwarded the money to Rector.

Thus, this is not a case where defendant was sentenced for the government's conduct instead of his own conduct. *Cf. United States v. Foley*, 906 F.2d at 1264–65 (court found that dialogue between undercover agent and defendant "demonstrates that neither person was contemplating another sale at that time. The agent simply inquired about the cost of two ounces.... The agent might just have easily asked what the price of a kilogram would be in an effort to have such amount later be factored into the [base offense level]").

We conclude that the district court properly attributed the additional 736 pounds of marijuana to defendant in determining a base offense level. We AFFIRM the judgment of the district court.