70 F.3d 1275
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Mario COLEMAN, Defendant-Appellant.
 No. 94-1336.
 United States Court of Appeals, Seventh Circuit.
 Argued Oct. 5, 1995.
Decided Nov. 30, 1995.
 
 Before EASTERBROOK, MANION and KANNE, Circuit Judges.
 
 ORDER
 
 1
 Mario Coleman pleaded guilty to attempting to possess with intent to distribute cocaine in violation of 21 U.S.C. Secs. 841(a)(1) and 846, and 18 U.S.C. Sec. 2. Coleman was sentenced to a 100-month term of imprisonment to be followed by five years of supervised release. On appeal, Coleman challenges his sentence. For the following reasons, the judgment of the district court is affirmed.
 
 PROCEDURAL HISTORY
 
 2
 On October 20 and 21, 1992, Coleman negotiated with Pascual Guerrero, an informant working with the Drug Enforcement Administration ("DEA"), to purchase two kilograms of cocaine for the price of $22,000 per kilogram. Coleman agreed to provide Guerrero with a Mercedes Benz 300 CE automobile as collateral in exchange for the cocaine with the promise to provide cash for the cocaine at a later date. On October 22, 1992, Coleman was arrested after meeting with Guerrero and a DEA undercover agent at a Summit, Illinois gas station to exchange the Mercedes for the cocaine.
 
 
 3
 On November 18, 1992, Coleman was charged in a two-count indictment with conspiracy to possess with the intent to distribute two kilograms of cocaine in violation of 21 U.S.C. Secs. 841(a)(1) and 846 (Count I), and attempting to possess with the intent to distribute two kilograms of cocaine in violation of 21 U.S.C. Secs. 841(a)(1) and 846, and 18 U.S.C. Sec. 2 (Count II). Coleman was arraigned on the indictment on November 25, 1992 and entered a plea of not guilty. Thereafter, on May 11, 1993, Coleman pleaded guilty to Count II. Count I of the indictment was dismissed on the government's motion.
 
 
 4
 A presentence investigation report ("PSI") was filed. Coleman objected to the PSI's recommendation that prior drug transactions occurring between Coleman and Guerrero were relevant conduct under U.S.S.G. Sec. 1B1.3(a)(2). Accordingly, Coleman's prior dealings with Guerrero were the focus of the January 6, 1994 sentencing hearing. At the hearing, the district court was presented with the PSI; Guerrero's videotape deposition (which was submitted prior to the hearing);[1] transcripts of four recorded telephone calls which took place between Coleman and Guerrero on October 20 and 21, 1992; the undercover conversations recorded at the Summit gas station on October 22, 1992; and Coleman's 1992 cellular telephone records.
 
 
 5
 Following the presentation of the evidence and the subsequent arguments of counsel concerning the issue of relevant conduct, the district court found that there was sufficient evidence to support a finding that Coleman engaged in prior drug dealings with Guerrero totalling four and one-half kilograms of cocaine and that these prior dealings were part of the "common scheme and same course of conduct" of the offense of conviction. U.S.S.G. Sec. 1B1.3(a)(2). Accordingly, with two kilograms from the offense of conviction and four and one-half kilograms from Coleman's prior dealings, the district court determined that the total quantity of cocaine involved in Coleman's course of drug-dealing was six and one-half kilograms. This gave Coleman a base offense level of thirty-two, U.S.S.G. Sec. 2D1.1(c)(4), which was reduced two levels for his acceptance of responsibility, U.S.S.G. Sec. 3E1.1(a). With a criminal history category of I, and an adjusted base offense level of thirty, the applicable Guidelines range was 97-121 months in prison. Coleman was sentenced within this range to a term of 100-months' imprisonment. This timely appeals follows.
 
 ISSUE
 
 6
 On appeal, Coleman argues that the district court erred in finding that his prior drug dealings with Guerrero were part of the same course of conduct as the offense of conviction.
 
 STANDARD OF REVIEW
 
 7
 The district court's findings of fact at sentencing need only be supported by a preponderance of the evidence, United States v. Garcia, 66 F.3d 851, 856 (7th Cir.1995), and they "will not be overturned unless they are clearly erroneous...." United States v. Hatchett, 31 F.3d 1411, 1418 (7th Cir.1994). A factual determination is clearly erroneous "only if, after reviewing the entire evidence, we are left 'with the definite and firm conviction that a mistake has been committed.' " United States v. Herrera, 878 F.2d 997, 1000 (7th Cir.1989) (quoting Anderson v. City of Bessemer City, 470 U.S. 564, 573 (1985)). "The quantity of drugs used to calculate a defendant's base offense level under section 2D1.1 presents a question of fact, and we thus review the district court's determination only for clear error." United States v. Montgomery, 14 F.3d 1189, 1196 (7th Cir.1994). The district court's "interpretation of the Sentencing Guidelines is subject to de novo review." Hatchett, 31 F.3d at 1418.
 
 DISCUSSION
 
 8
 The base offense level under the Guidelines for offenses involving possession (and attempted possession) of cocaine depends upon the quantity of cocaine involved in the crime. U.S.S.G. Sec. 2D1.1(a)(3). A defendant may be sentenced based on the quantity of drugs involved in uncharged or unconvicted criminal activity when this activity is considered "part of the 'same course of conduct or common scheme or plan as the offense of conviction.' " Hatchett, 31 F.3d at 1419 (quoting United States v. Crawford, 991 F.2d 1328, 1331 (7th Cir.1993); citing U.S.S.G. Sec. 1B1.3(a)(2)). "Whether the transactions are part of the same course of conduct as the offense of conviction depends upon the similarity, regularity and temporal proximity of the incidents in question." United States v. Cedano-Rojas, 999 F.2d 1175, 1180 (7th Cir.1993). Hence, "when a sentencing court decides to increase a defendant's offense level based on uncharged or unconvicted activities, the court 'should explicitly state and support, either at the sentencing hearing or (preferably) in a written statement of reasons, its finding that the unconvicted activities bore the necessary relation to the convicted offense.' " United States v. Thomas, 969 F.2d 352, 355 (7th Cir.) (quoting United States v. Duarte, 950 F.2d 1255, 1263 (7th Cir.1991)), cert. denied, 113 S.Ct. 274 (1992). Coleman argues that the district court erred in finding his prior dealings with Guerrero to be part of the same course of conduct as the offense of conviction. We disagree.
 
 
 9
 The offense of conviction occurred as follows. Several weeks prior to Coleman's arrest, Coleman called Guerrero and asked him if he wanted to do a drug deal. Guerrero told Coleman to contact him later. Guerrero then informed the DEA of Coleman's proposition. The DEA instructed Guerrero to set up a drug deal if Coleman called him back. On October 20 and 21, Guerrero and Coleman spoke four times on the telephone. During the calls, Coleman stated that he was interested in purchasing two kilograms of cocaine. He also said that he wanted to use his Mercedes as collateral and that once he sold the cocaine he would pay Guerrero. Guerrero agreed to these terms. Thereafter, on October 22, 1992, Coleman met with Guerrero and a DEA undercover agent at a gas station in Summit, Illinois. Coleman drove to the deal in his Mercedes. Guerrero and the undercover agent arrived in an undercover vehicle. When Coleman, Guerrero, and the undercover agent arrived, it was confirmed that Coleman would leave the Mercedes with Guerrero and the undercover agent until Coleman paid for the two kilograms of cocaine. Coleman entered the undercover car, retrieved the two kilogram package of cocaine, and inspected it. Coleman then exited the vehicle and motioned to the Mercedes. One of the individuals accompanying Coleman to the deal drove the Mercedes to where the undercover car was parked. Coleman was then placed under arrest.
 
 
 10
 In determining whether Coleman's prior dealings with Guerrero were part of the same course of conduct as the offense of conviction, the district court considered Guerrero's December 3, 1993 videotape deposition; the recorded conversations between Coleman and Guerrero on October 20 and 21, 1992; and Coleman's 1992 phone records. This evidence provided as follows.
 
 
 11
 Guerrero testified that on ten separate occasions prior to the October 22, 1992 deal, he sold Coleman approximately eleven kilograms of cocaine. These prior transactions began in the summer of 1991 and ended in the spring or early summer of 1992. Each transaction involved from one-quarter to three kilograms of cocaine and, with the exception of the first deal, each took place at a gas station in the Chicago metropolitan area (either at a gas station in Summit, Illinois, or a gas station in Chicago). All transactions were arranged by telephone. In most of the transactions, Guerrero would sell the cocaine to Coleman on credit, who would pay for it at a later date. In one particular deal, occurring in late winter or early spring of 1992, Coleman used a Mercedes Benz (the same car used in the October 22, 1992 deal) as collateral to secure a purchase of two and one-half kilograms of cocaine. Once the cocaine was paid for, Guerrero returned the car to Coleman. There were two breaks in Guerrero's drug dealings with Coleman. The first occurred in latter part of 1991, when Guerrero's supply was depleted. The second occurred during the summer and early fall of 1992. It appears that this second break was the result of Guerrero's arrest in July of 1992.
 
 
 12
 Guerrero's testimony was corroborated, in part, with the transcripts of the four recorded telephone conversations of October 20 and 21, 1992, and Coleman's 1992 cellular phone records. The recorded telephone conversations demonstrated that Coleman had prior dealings with Guerrero regarding the sale of cocaine.[2] The phone conversations additionally established that Coleman's Mercedes Benz had been used as collateral in one of these prior transactions. (Transcript of October 20, 1992 Telephone Call, at 2-5.) Finally, the phone records for Coleman's cellular phone evidenced frequent contact between Coleman and Guerrero, listing a total of seventy-nine calls from February to October of 1992--thirty-six in February, three in March, eighteen in April, fourteen in May, and eight in October.
 
 
 13
 At the sentencing hearing, the district court explained its finding that Coleman's prior drug dealings with Guerrero were part of the same course of conduct as the offense of conviction:
 
 
 14
 Based upon the testimony of Mr. Guerrero, it looks fairly clear and detailed that there were prior dealings involving Mr. Coleman and Mr. Guerrero; that these dealings were, really, a course of conduct; that there had been a relationship that continued from, at least, early in 1992. It may have been longer but at least 1992. That is corroborated by the phone records. The Court will find that they are of the same course of common scheme, plan or same course of conduct and all involved the use of Mr. Guerrero as the supplier to Mr. Coleman. They all involved arrangements made over the telephone and then subsequent meetings, at which time there was an exchange. At least most of them involved the consignment or "fronting" of the drugs, which is referred to in the trade, which, as I understand it, rather than paying for the drugs, it was given on credit and then Mr. Coleman would subsequently pay for the drugs out of the proceeds of later sales or, at least, some later time. That there was a dispute involving the portion of drugs. There had been a prior occasion when this car was posted as security.
 
 
 15
 So, it would seem that, at least, the quarter, the half, the one, the quarter and a two-and-a-half prior dealings, which would be four-and-a-half kilograms of cocaine, which the Court would find was part of a common scheme and the same course of conduct, therefore being relevant conduct....
 
 
 16
 (Sentencing Transcript at 22-23.)
 
 
 17
 Coleman argues that since there was no regularity of time between the prior transactions (some occurred within days and weeks and some occurred after months had gone by) and there was no temporal proximity between the prior drug deals and the offense of conviction, the prior deals were not within the same course of conduct as the offense of conviction. We disagree.
 
 
 18
 As stated above, in determining whether transactions are part of the same course of conduct, this court looks to the "similarity, regularity and temporal proximity of the incidents in question." Cedano-Rojas, 999 F.2d at 1180. Here, the prior transactions were not "regular" in the sense that they occurred every week or every month. Guerrero's testimony, though, indicates that there were ten transactions from the summer of 1991 through the spring of 1992, with only one significant break in contact between Coleman and Guerrero. This break was the result of the depletion of Guerrero's supply. Clearly, the prior transactions were sufficiently regular to demonstrate that they were not isolated incidents but, rather, that they were part of a common scheme or course of conduct.
 
 
 19
 There is a lack of temporal proximity, however, between the prior transactions and the offense of conviction--there does not appear to be any contact between Coleman and Guerrero from June to October of 1992. This is a significant period of time. See, e.g., United States v. Mullins, 971 F.2d 1138, 1144 (4th Cir.1992); United States v. Hahn, 960 F.2d 903, 911 (9th Cir.1992), cert. denied, 114 S.Ct. 394 (1993). The government argues that since the break in contact between Coleman and Guerrero was the result of Guerrero's arrest in July of 1992, the lapse should not adversely impact a finding of relevant conduct. See Cedano-Rojas, 999 F.2d at 1180 ("A respite is unlikely to be fatal in the finding of a course of conduct if the interruption is not the choice of the players."); United States v. Nunez, 958 F.2d 196, 198 (7th Cir.), cert. denied, 113 S.Ct. 168 (1992) (two-year break in activity did not upset a finding that the prior transactions were part of the same course of conduct, in part, because the lapse resulted from the buyer's arrest and incarceration). Coleman points out, however, that Guerrero testified that when he was arrested in July 1992, and he was asked to give a list of names of people he was dealing with, he did not give Coleman's name. Guerrero stated that he did not give the DEA Coleman's name because he was not actively dealing with him at the time. Coleman claims that this testimony establishes that the break in contact was not the result of the arrest but, rather, that it was voluntary.
 
 
 20
 Although Guerrero's testimony demonstrates that the break in contact from June to July of 1992 was voluntary, whether it shows that the continued break in activity, from July to October, was also voluntary (and not a result of Guerrero's arrest) is questionable. However, regardless of whether all or part of this break in contact was voluntary, the prior dealings are sufficiently similar to the offense of conviction to support a finding of relevant conduct.
 
 
 21
 We have held that "a court may find a course of conduct even without regularity and temporal proximity, 'when there is a "stronger showing" of similarity between the offense of conviction and the uncharged conduct.' " Garcia, 66 F.3d at 860 (quoting Cedano-Rojas, 999 F.2d at 1180) (emphasis omitted). "In considering the similarity of the conduct in question, a court must look to the identity of participants and their roles in the events at issue, as well as the nature, structure and location of the allegedly related transactions, to determine whether the transactions are sufficiently related for purposes of Sec. 1B1.3(a)(2)." Cedano-Rojas, 999 F.2d at 1180. Clearly, the prior transactions are sufficiently similar to the offense of conviction to overcome any lack of regularity or proximity. In both the offense of conviction and Coleman's prior dealings, Guerrero was the seller and Coleman was the purchaser of cocaine. They all involved a relatively large quantity of cocaine; from one-quarter to three kilograms. All of the transactions were arranged over the telephone and the actual exchange of cocaine always occurred in the Chicago metropolitan area at a gas station; either in Summit Illinois or Chicago proper. In addition, most of the prior transactions, like the offense of conviction, involved Coleman's purchase of the cocaine on credit (sometimes with collateral). Indeed, one of the prior deals involved the same collateral used in the October 22 deal--Coleman's Mercedes.[3]
 
 
 22
 Coleman next argues that Guerrero's videotape testimony lacked consistency and accuracy and, therefore, it should have been discredited by the district court. Specifically, Coleman notes that while Guerrero informed a DEA officer that Coleman purchased a total of eleven kilograms of cocaine from him on five occasions, PSI at 1, in his videotape deposition, Guerrero testified that Coleman's purchase of the eleven kilograms occurred on ten prior occasions. Coleman claims that Guerrero's credibility is further undermined by Guerrero's failure to recall the precise dates of the prior transactions, as well as his difficulty in remembering drug quantities.
 
 
 23
 This court will not "reweigh evidence or assess the credibility of witnesses." United States v. Ferguson, 35 F.3d 327, 331 (7th Cir.1994), cert. denied, 115 S.Ct. 1832 (1995). " '[S]o long as the information which the sentencing judges considers has sufficient indicia of reliability to support its probable accuracy, the information may properly be taken into account in passing sentence.' " Cedano-Rojas, 999 F.2d at 1180 (quoting United States v. Lueddeke, 908 F.2d 230, 234 (7th Cir.1990)).
 
 
 24
 Guerrero's December 3 testimony was corroborated with the recorded phone conversations of October 20 and 21, 1992, and Coleman's phone records.[4] Moreover, the deficiencies in Guerrero's testimony were not serious. Although Guerrero's deposition testimony was inconsistent with a prior statement made to a DEA agent regarding the number of prior drug transactions involving Coleman, at his December 3 deposition, Guerrero was able to distinguish and describe each of the ten prior transactions. The apparent inaccuracy in Coleman's prior statement does not render his deposition testimony incredible. In addition, despite the fact that Guerrero was not able to provide specific dates of the drug transactions, his testimony did establish a time frame within which the transactions occurred--he testified that there was a course of conduct with Coleman involving ten prior dealings occurring from the summer of 1991 through late spring or early summer of 1992. Finally, there is no indication that Guerrero had any difficulty remembering the specific drug quantities involved in the prior transactions. The district court was entitled to credit Guerrero's testimony.
 
 
 25
 Coleman additionally argues that the testimony of one witness is not sufficient to support a finding of relevant conduct. As stated above, Guerrero's testimony was corroborated, at least in part, with other evidence. In any event, "[t]he testimony of one witness, even one arguably biased against the defendant, is sufficient to support a finding of fact." Cedano-Rojas, 999 F.2d at 1180.
 
 
 26
 For the foregoing reasons, the judgment of the district court is AFFIRMED.
 
 
 
 [1]
 Prior to sentencing, Guerrero surrendered to the United States Bureau of Prisons ("BOP") to begin serving a sentence resulting from a federal narcotics conviction to which he had pleaded guilty. Guerrero was listed by the BOP as a candidate for its shock incarceration program, 18 U.S.C. Sec. 4046, and therefore was unavailable for live testimony at Coleman's upcoming sentencing hearing. Accordingly, on December 3, 1993, Guerrero was deposed at his correctional institution. His testimony was videotaped and subsequently presented to the district court in preparation for the sentencing hearing
 
 
 [2]
 In setting up the October 22, 1992 deal, Coleman made the following statements to Guerrero, referring to their prior dealings together:
 [W]e gonna have to come up with a solution for that, for that last one, right? ... Because there wasn't what it was supposed to have been and then it was all fucked up.... I just don't want you to run out.... Oh, see, I'm sayin you, ah, you always say that, then you be runnin out.... Then I'll be stuck again.... And I, every time I finish them two, I like you just bring give me two more, whatever, we do it just like that.
 (Tr. of October 20, 1992 Telephone Call, at 6-7.)
 
 
 [3]
 This prior transaction was so similar to the offense of conviction that Coleman concedes that it could properly be considered relevant conduct
 
 
 [4]
 The phone conversations indicated that Coleman had prior dealings with Guerrero; one which included using Coleman's Mercedes Benz as collateral, as Coleman did in the October 22 deal. Coleman's phone records evidenced constant contact between Coleman and Guerrero from February through May of 1992